T.C. Memo. 2011-177

UNITED STATES TAX COURT

JONATHAN S. AND TRACY A. LANDOW, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 15506-09, 20206-09.    Filed July 25, 2011.

<u>David D. Aughtry</u> and <u>Hale E. Sheppard</u>, for petitioners.

<u>Jennifer K. Martwick</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

CHIECHI, <u>Judge</u>:  Respondent determined the following deficiencies in, additions under section 6651(a)(1)[1] to, and

---

[1]All section references are to the Internal Revenue Code in effect at all relevant times.  All Rule references are to the Tax Court Rules of Practice and Procedure.

accuracy-related penalties under section 6662(a) on petitioners'

Federal income tax (tax):

|  |  | Addition to Tax Under | Accuracy-Related Penalty |
| --- | --- | --- | --- |
| Year | Deficiency | Sec. 6651(a)(1) | Under Sec. 6662(a) |
| 2003 | $4,318,104.00 | -- | $863,620.80 |
| 2004 | 749.00 | -- | -- |
| 2005 | 93,009.45 | $3,962.45 | 18,601.89 |
| 2006 | 89,040.00 | -- | 17,808.00 |
| 2007 | 211,976.00 | 16,300.70 | 42,395.20 |

The issues remaining for decision are:[2]

(1) Did a certain transaction in 2003 between petitioner Jonathan S. Landow and Derivium Capital, LLC, constitute a loan or a sale of securities?  We hold that that transaction was a sale of securities by petitioner Jonathan S. Landow.

(2) In the light of our holding with respect to issue 1, are petitioners required to recognize under section 1042(e) any gain realized on the sale of securities by petitioner Jonathan S. Landow described in that issue?  We hold that they are.

(3) In the light of our holdings with respect to issues 1 and 2, are petitioners entitled to defer under section 1033 any gain realized on the sale of securities by petitioner Jonathan S. Landow described in issue 1?  We hold that they are not.

_____

[2]Our resolution of the issues presented for petitioners' taxable year 2003 in the case at docket No. 15506-09 resolves the issues presented for their taxable years 2005, 2006, and 2007 in the case at docket No. 20206-09.  Petitioners concede the deficiency for their taxable year 2004, which is not related to the issues presented here.

FINDINGS OF FACT

All of the facts in these cases, which the parties submitted under Rule 122, have been stipulated by the parties and are so found.[3]

Petitioners resided in New York at the time they filed the petitions in these cases.

In 1994, petitioner Jonathan S. Landow (Mr. Landow) organized New York Medical, Inc. (NY Medical), under the laws of Delaware. Mr. Landow has developed NY Medical into a successful provider of medical services.

Around early 2000, Mr. Landow was considering diversifying his personal assets and simultaneously rewarding employees of NY Medical through the establishment of an employee stock ownership plan (ESOP). In May 2000, Mr. Landow contacted Irwin Selinger of Corporate Solutions Group, LLC (CSG), an affiliate of American Express Corporate Services, to assist him in establishing an ESOP for NY Medical. Around July 25, 2000, NY Medical and CSG executed an agreement (ESOP advisory agreement) pursuant to which CSG was to provide certain services to NY Medical, including establishing and implementing an ESOP, financing that ESOP's purchase of certain stock of NY Medical from Mr. Landow, and

---

[3]The parties reserved objections based on relevancy to certain of the stipulated facts. We need not and shall not address those respective objections. That is because we have not relied on any of the facts to which the parties reserved those objections in resolving the issues presented.

aiding Mr. Landow to defer under section 1042 any gain that he realized on his sale of that stock. On a date not established by the record, NY Medical established the New York Medical, Inc., Employee Stock Ownership Trust (NY Medical ESOP) that was to be effective on January 1, 2000.

At a time not established by the record between July and November 2000, NY Medical and Mr. Landow decided to engage in a so-called seller-financed ESOP transaction with leveraged quali-fied replacement property (QRP), as defined in section 1042. After that decision and pursuant to the ESOP advisory agreement, CSG solicited on behalf of NY Medical certain information from various financial institutions regarding the terms on which those financial institutions would lend NY Medical the funds necessary to purchase certain stock of that company from Mr. Landow. At a time not established by the record, NY Medical decided to obtain financing for that purchase from Citibank, N.A. (Citibank).

On November 30, 2000, NY Medical, Mr. Landow, and Citibank executed a letter agreement (Citibank letter agreement), and NY Medical executed a demand note (Citibank demand note) payable to Citibank. Pursuant to that letter agreement, Citibank agreed to lend NY Medical $15 million, which was the amount payable under that demand note. The Citibank letter agreement provided in pertinent part:

> As a condition to our [Citibank] making funds available to NY Med[ical], NY Med[ical] shall use the

proceeds to immediately make a $15,000,000 loan to the ESOT [the NY Medical ESOP] (the "ESOT Loan"). The ESOT shall use the proceeds of the ESOT Loan to purchase the stock of NY Med[ical] from Landow. Landow shall use the proceeds of the sale of the stock to make a loan to NY Med[ical] (the "Sub Loan"). NY Med[ical] shall use the proceeds of the Sub Loan to repay our advance [of $15 million] under the Note. The proceeds shall be advanced to each party under the Blocked Account Agreements[4] referred to above. This letter shall serve as an instruction letter from each party to us to advance the funds from each of the Blocked Accounts to fund the ESOT Loan, the Stock purchase and the Sub Loan. NY Med[ical] hereby instructs us to debit the Blocked Account maintained on behalf of NY Med[ical] and apply the amounts therein to repay the advance under the Note.

---

[4]On Nov. 30, 2000, NY Medical, the NY Medical ESOP, and Mr. Landow separately executed respective documents, each of which was titled "BLOCKED ACCOUNT AGREEMENT" (blocked account agreement). Each of those blocked account agreements contained materially identical provisions. The blocked account agreement that Mr. Landow executed provided in pertinent part:

2. The Customer [Mr. Landow] has opened the Pledged Account and will cause to be deposited therein and will maintain therein cash from time to time. The Customer hereby pledges to the Bank, and grants to the Bank a lien, mortgage and security interest in, all cash or other assets deposited from time to time in the Pledged Account. At any time amounts are due and payable to the Bank with respect to the obligations of the Customer to the Bank, including the obligations under Customer's guaranty of the $15,000,000 Demand Note of the New York Medical, Inc. to the Bank dated as of the date hereof (the "Obligations"), whether prior to or during the occurrence of a default or Event of Default and whether or not Bank has made any demand or the Obligations have matured, the Bank may, at its discretion, may [sic] appropriate and apply the funds in the Pledged Account to the payment of the Obligations. The Bank shall have sole dominion and control over the Pledged Account. * * *

Pursuant to the Citibank letter agreement, on November 30, 2000, (1) Citibank lent NY Medical $15 million, (2) NY Medical used the proceeds of that loan in order to lend the NY Medical ESOP $15 million, (3) the NY Medical ESOP used those proceeds to purchase from Mr. Landow 450,000 shares of NY Medical's stock for $15 million, (4) Mr. Landow used those proceeds to lend NY Medical $15 million, and (5) NY Medical used the proceeds of that loan to pay Citibank $15 million in full satisfaction of its obligation under the Citibank demand note. After the above-described transactions were effected, Mr. Landow (1) did not retain any cash from his sale of certain stock of NY Medical to the NY Medical ESOP and (2) held a note of NY Medical in the amount of $15 million evidencing his loan to that company.

After the sale of certain of Mr. Landow's stock of NY Medical to the NY Medical ESOP, Mr. Landow sought to purchase certain QRP in order to defer under section 1042 recognition of any gain that he had realized on the sale of that stock. Because, as discussed above, Mr. Landow did not retain any cash from his sale of certain stock of NY Medical to the NY Medical ESOP, he was unable to buy that QRP without borrowing the funds to do so. Citibank offered to extend Mr. Landow a line of credit not exceeding $12 million in order to facilitate Mr. Landow's purchase of certain QRP.

On November 1, 2000, NY Medical, Mr. Landow, and Citibank executed a document titled "REVOLVING CREDIT NOTE (Multiple Advances)" (revolving credit note). Pursuant to that note, Citibank made available to Mr. Landow a line of credit not exceeding $12 million (Citibank line of credit), which was a recourse loan and on which Mr. Landow was allowed to draw during the period November 1, 2000, to October 31, 2001. Pursuant to the revolving credit note, in the event of Mr. Landow's default under that note Citibank retained "all of the rights and remedies provided to it (i) under the Loan Documents, (ii) under applicable laws, and (iii) as a secured party by the Uniform Commercial Code in effect in New York State at that time." The revolving credit note also required Mr. Landow to maintain a minimum net worth of not less than $30 million.

The revolving credit note permitted Mr. Landow to choose at the time he drew against the line of credit thereunder one of two alternative methods of calculating interest: (1) An interest rate that was one percentage point greater than the LIBOR rate as defined in that note[5] or (2) an interest rate that was one and

---

[5]The revolving credit note defined the term "LIBOR rate" as the interest rate that Citibank's London office offered to prime banks in the London interbank market.

one-half percentage points less than the base rate as defined in that note.[6]

On November 1, 2000, Mr. Landow executed a document titled "General Hypothecation Agreement" (hypothecation agreement). Pursuant to that agreement, Mr. Landow pledged as security for the Citibank line of credit certain rights to the QRP that he intended to purchase with the loan proceeds that he borrowed against that line of credit. In this regard, the hypothecation agreement provided in pertinent part:

> I. That, as security for all indebtedness and other liabilities of the undersigned [Mr. Landow] * * * pursuant to the Revolving Credit Note dated the date hereof * * * (the "Note"), together with all obligations of the undersigned hereunder or under any other document or agreement executed and delivered by the undersigned in connection with the Note and this Agreement (the "Obligations"), the Lender [Citibank] shall have and is hereby given a lien upon and a security interest in any and all property in which the undersigned at any time has rights and which at any time has been delivered, transferred, pledged, mortgaged or assigned to, or deposited in or credited to an account with, the Lender, or any third party(ies) acting in its behalf or designated by it, including, but not limited to, Pledged Collateral (as herein defined)[7] contained

---

[6]The revolving credit note defined the term "base rate" as the interest rate that Citibank periodically published as its base rate.

[7]The hypothecation agreement defined the term "Pledged Collateral" to mean:

The undersigned [Mr. Landow] will maintain at all times in the Pledged Account assets acceptable to the Lender [Citibank], consisting of Eligible Floating Rate Notes, Eligible CP [commercial paper] and other marketable securities, cash and cash equivalents. Such Eligible

(continued...)

in the Pledged Account (as herein defined),[8] or other-wise at any time is in the possession or under the control or recorded on the books of or has been trans-ferred to the Lender, or any third party(ies) acting in its behalf or designated by it, whether expressly as collateral or for safekeeping or for any other or different purpose, * * * and in any and all property in which the undersigned at any time has rights and in which at any time a security interest has been trans-ferred to the Lender.  Stock dividends and the distri-butions on account of any stock or other securities subject to the terms and provisions hereof, including FRN Interest (as herein defined)[9] shall be deemed an increment thereto and if not received directly by the Lender shall be delivered immediately to it by the undersigned in form for transfer.

       *      *      *      *      *      *      *

    III.  That, in addition to its rights and inter-ests as herein set forth, the Lender may, at its option at any time(s) following the occurrence of an Event of Default and with notice to the undersigned, appropriate and apply to the payment or reduction, either in whole or in part, of the amount owing on any one or more of the Obligations, whether or not then due, any and all moneys now or hereafter with the Lender, any affiliate of the Lender or any third party acting in its behalf

---

[7](...continued)
Floating Rate Notes, Eligible CP and other marketable securities, cash and cash equivalents, and any addi-tional securities, cash and cash equivalents pledged to the Lender from time to time and deposited in the Pledged Account, together with any income and distribu-tions in connection with the securities and any pro-ceeds thereof deposited in the Pledged Account, as to which the Lender has a perfected first position secu-rity interest * * *

[8]The hypothecation agreement defined the term "Pledged Account" to mean "Account No. * * * in the name of the under-signed [Mr. Landow] maintained by Citibank, N.A."

[9]The hypothecation agreement defined the term "FRN Interest" to mean "All interest paid in respect of Eligible Floating Rate Notes and Eligible CP [commercial paper]".

or designated by it, on deposit or otherwise to the credit of or belonging to the undersigned, it being understood and agreed that the Lender shall not be obligated to assert or enforce any rights, liens or security interests hereunder or to take any action in reference thereto, and that the Lender may in its discretion at any time(s) relinquish its rights as to particular property or in any instance without thereby affecting or invalidating its rights hereunder as to any other property hereinbefore referred to or in any similar or other circumstance.

        \*      \*      \*      \*      \*      \*      \*

VII.  That the Lender may, at its option and without obligation to do so, transfer to or register in the name of its nominee(s), including any "clearing corporation" or "custodian bank" as defined in the Uniform Commercial Code in effect in New York State and any nominee(s) thereof, all or any part of the afore-mentioned property and it may do so before or after the maturity of any of the Obligations and with or without notice to the undersigned.

VIII.  That the Lender may assign or otherwise transfer all or any of the Obligations, and may deliver all or any of the property to the transferee(s), who shall thereupon become vested with all the powers and rights in respect thereof given to the Lender herein or otherwise and the Lender shall thereafter be forever relieved and fully discharged from any liability or responsibility with respect thereto, all without preju-dice to the retention by the Lender of all rights and powers not so transferred.  Furthermore that the Lender may, in connection with any such assignment, transfer or delivery, disclose to the assignee or transferee or proposed assignee or proposed transferee any informa-tion relating to the undersigned furnished to the Lender by or on behalf of the undersigned, provided, that, prior to any such disclosure, the assignee or transferee or proposed assignee or proposed transferee shall agree to preserve the confidentiality of any confidential information related to the undersigned received by it from the Lender.

        \*      \*      \*      \*      \*      \*      \*

XV.  That the following additional terms and conditions are as set forth below:

       *       *       *       *       *       *       *

(g) <u>Minimum Collateral Value</u>.  The undersigned shall comply with the following minimum collateral value requirements.

       *       *       *       *       *       *       *

(iii) If at any time the undersigned has not satisfied the obligation to deposit additional Pledged Collateral or repay the Obligations as required in the event of an FRN Facility Margin Call, such occurrence shall be deemed an Event of Default, and the Lender shall have the immediate right, without notice or other action * * * to exercise any or all of the remedies available to the Lender under this Agreement or otherwise, including the right to immediately sell the Pledged Collateral.

On November 1, 2000, NY Medical executed a document titled "GENERAL SECURITY AGREEMENT".  Pursuant to that agreement, NY Medical granted to Citibank a security interest in all of NY Medical's assets as collateral for its obligations under the revolving credit note.

Between November 2, 2000, and November 29, 2001, Mr. Landow purchased as QRP the following floating rate notes (FRNs)[10] at a total cost of $15 million:

---

[10]A floating rate note is a debt instrument with a variable interest rate that is determined on the basis of a certain benchmark (e.g., the yield for U.S. Treasury bills).  The interest rate on an FRN is adjusted periodically to reflect any changes in the relevant benchmark.

| Date of Purchase | Principal Amount | Issuer | Date of Maturity |
|---|---|---|---|
| 11/2/2000 | $3,094,000 | Proctor & Gamble | 8/15/2050 |
| 11/2/2000 | 3,000,000 | E.I. Dupont | 12/27/2039 |
| 6/20/2001 | 3,000,000 | Merck & Co. | 12/27/2040 |
| 9/17/2001 | 3,000,000 | United Parcel Service | 6/21/2051 |
| 11/13/2001 | 1,500,000 | Minnesota Mining | 12/21/2041 |
| 11/29/2001 | 1,156,000 | Minnesota Mining | 12/21/2041 |
| 11/29/2001 | 250,000 | E.I. Dupont | 10/9/2041 |

(We shall refer collectively to the FRNs that Mr. Landow purchased between November 2, 2000, and November 29, 2001, as the FRN portfolio.)

During December 2001, Mr. Landow received proposals from certain financial institutions, including Citibank and J.P. Morgan Chase, in which those institutions proposed to make available to Mr. Landow a line of credit not exceeding $13.5 million.

On February 11, 2002, Mr. Landow and petitioner Tracy A. Landow (Ms. Landow) executed the following documents that amended the revolving credit note and the hypothecation agreement: (1) A document titled "Amended and Restated REVOLVING CREDIT NOTE (Multiple Advances)" (amended revolving credit note) and (2) a document titled "Amended and Restated General Hypothecation Agreement" (amended hypothecation agreement).

The amended revolving credit note amended the revolving credit note by (1) increasing to $13.5 million the line of credit that Citibank was to make available to Mr. Landow (Citibank

increased line of credit), (2) substituting Ms. Landow for NY Medical as a borrower under that note, and (3) reducing to $15 million the minimum net worth that petitioners were to maintain. In all other material respects, the amended revolving credit note was identical to the revolving credit note.

The amended hypothecation agreement did not make any material amendments to the portions of the hypothecation agreement quoted above. The only amendments that the amended hypothecation agreement made to the terms of that hypothecation agreement were to (1) increase to $13.5 million the line of credit that Citibank was to make available to Mr. Landow, (2) add reference to Ms. Landow as a borrower on the amended revolving credit note, and (3) delete from the definition of the term "Pledged Collateral" the references in the hypothecation agreement to "Eligible CP". (We shall refer to the transactions by which Citibank extended the Citibank line of credit and the Citibank increased line of credit, Mr. Landow drew upon those lines of credit to purchase the FRNs, and he pledged as collateral those FRNs as the Citibank transaction.)

As of December 31, 2002, the end of petitioners' taxable year 2002, Mr. Landow met the requirements of section 1042 with respect to his sale of certain stock of NY Medical to the NY Medical ESOP. As a result, Mr. Landow was not required to recognize any of the gain that he realized on that sale.

In proposing a line of credit to Mr. Landow, Citibank informed him that the use of FRNs as QRP would achieve a result known as "zero-cost borrowing",[11] which was Mr. Landow's objective. However, Citibank failed to provide such zero-cost borrowing during 2001 and 2002. As a result, Mr. Landow did not meet his objective of zero-cost borrowing and therefore Mr. Landow retained CSG on June 12, 2002, in order to assist him in negotiating with a different lender a new loan of $13.5 million that would replace the Citibank increased line of credit.

From June to August 2002, Mr. Landow negotiated with Morgan Stanley Dean Witter & Co. (Morgan Stanley) regarding that company's refinancing the Citibank increased line of credit. On June 17, 2002, Morgan Stanley sent Mr. Landow a letter in which it proposed providing him with a so-called margin loan of $13.5 million at an interest rate equal to the three-month London interbank offered rate plus 35 basis points.[12] In that letter, Morgan Stanley also indicated that, as security for such a loan, it would require Mr. Landow to deposit with Morgan Stanley not only the FRN portfolio but also $5 million of additional assets.

---

[11]Zero-cost borrowing was possible, according to Citibank, because the interest that Mr. Landow earned on the FRNs would entirely offset the periodic interest that Citibank charged on any line of credit that it made available to him.

[12]A basis point is equal to 0.01 percent.

On July 10, 2002, Morgan Stanley sent Mr. Landow a second letter in which it changed to its so-called cost-of-funds index rate the interest rate that it would set for any margin loan that it agreed to make to him.[13]  In that letter, Morgan Stanley also proposed charging Mr. Landow a management fee of 1.25 percent of the $5 million of assets that that company required as additional security for any $13.5 million margin loan that it made to him.

Around August 2002, CSG informed Mr. Landow about Derivium Capital, LLC (Derivium).  Sometime later in 2002, Mr. Landow conducted certain research into Derivium and its founder, Charles Cathcart (Mr. Cathcart).  As part of that research, Mr. Landow read numerous articles and other materials about Derivium and Mr. Cathcart as well as certain marketing materials that Derivium had prepared.  In addition, Mr. Landow engaged certain independent financial advisors and legal advisors to assist him in evaluating Derivium and any transactions that it might propose to him.

On August 19, 2002, Derivium prepared a separate document titled "ESOP QRP LOAN--INDICATIVE FRN LOAN TERM SHEET" (proposed

---

[13]Morgan Stanley's cost-of-funds index rate was calculated by using certain short-term interest rate indices.

loan term sheet)[14] with respect to each of Mr. Landow's FRNs.[15]
In each of those documents, Derivium proposed to lend Mr. Landow
on a nonrecourse basis 90 percent of the face value of the FRN to
which the document pertained at a net interest rate calculated by
reference to either the one-month London interbank offered rate
or the three-month London interbank offered rate and taking into
account interest paid on that FRN.  Each of the proposed loan
term sheets proposed prohibiting (1) Derivium from calling before
maturity the loan to which each such sheet pertained unless Mr.
Landow was in default on that loan and (2) Mr. Landow from
prepaying before maturity the principal of that loan.  The
respective proposed loan term sheets set forth the terms of the
proposed loans as ranging from 27 to 38 years and required annual
net interest payments on those loans (i.e., the respective

---

[14]Our use of terms like "loan", "lend", "collateral", "borrow", "maturity", and "interest" when describing the proposed transaction and the actual transaction between Mr. Landow and Derivium is for convenience only.  Our use of any such terms is not intended to imply, and does not imply, that the transaction at issue between Mr. Landow and Derivium constitutes a loan for tax purposes.

[15]Although we have found that Mr. Landow purchased seven FRNs, he purchased on different dates in November 2001 two FRNs issued by Minnesota Mining, both with maturity dates of Dec. 21, 2041.  In making its proposals to Mr. Landow, Derivium treated and referred to those two FRNs as one FRN, and for convenience we shall refer to those two FRNs as one FRN.  As discussed below, Derivium proposed to make only one loan to Mr. Landow with respect to the two FRNs issued by Minnesota Mining and separate loans with respect to the remaining five FRNs that Mr. Landow purchased, or a total of six loans.

amounts, if any, that Mr. Landow was to pay after taking into account the respective interest payments under the FRNs) that ranged from $1,207.50 to $15,098.72 depending on the respective face values of the FRNs.

On August 29, 2002, Derivium sent Mr. Landow certain information with respect to the loans that Derivium proposed to make to him (proposed Derivium loans), including a document titled "MASTER AGREEMENT TO PROVIDE FINANCING AND CUSTODIAL SERVICES" and a separate schedule A with respect to each of his FRNs. Each of those schedules contained information that was materially identical to the information contained in the respective proposed loan term sheets that Derivium had prepared with respect to those FRNs.

On September 20, 2002, Derivium sent Mr. Landow certain sample documents, including sample documents titled (1) "MASTER AGREEMENT TO PROVIDE FINANCING AND CUSTODIAL SERVICES", (2) "SCHEDULE A-1 PROPERTY DESCRIPTION AND LOAN TERMS", and (3) "SCHEDULE D DISCLOSURE ACKNOWLEDGEMENT AND BROKER/BANK INDEMNIFICATION".

From September 23 to 26, 2002, Derivium sent Mr. Landow revised versions of certain of the documents that it had sent to him on August 29, 2002. Those revised versions of those documents did not materially differ from the documents that Derivium had sent to Mr. Landow on August 29, 2002.

At Mr. Landow's request, around January 16, 2003, Derivium sent him revised versions of respective schedules A, numbered A-1 through A-6, with respect to the six loans for which his FRNs were to serve as collateral (revised proposed schedules A).[16] Each of those schedules provided that Mr. Landow was permitted to pay before maturity the principal of the loan to which each such schedule pertained but only under limited conditions.

On a date not disclosed by the record between January 16 and March 7, 2003, Mr. Landow requested from Derivium additional revisions to certain of the documents that Derivium had sent to him with respect to the proposed Derivium loans.[17] On March 7, 2003, Mr. Cathcart sent to Mr. Landow a letter responding to that request. That letter stated in pertinent part:

> To address the concern about what would happen in a bankruptcy setting, we have the following suggested language that we have added in another case: "DC and

---

[16]The respective revised proposed schedules A, numbered A-1 through A-6, pertained to the respective loans for which the following FRNs were to serve as collateral:

| Schedule No. | FRN |
|---|---|
| A-1 | E.I. Dupont maturing 10/9/2041 |
| A-2 | United Parcel Service maturing 6/21/2051 |
| A-3 | E.I. Dupont maturing 12/27/2039 |
| A-4 | Merck & Co. maturing 12/27/2040 |
| A-5 | Minnesota Mining maturing 12/21/2041 |
| A-6 | Proctor & Gamble maturing 8/15/2050 |

[17]The record does not contain any letter or other communication by which Mr. Landow requested certain revisions to certain of the documents that Derivium had sent him.

the Lender acknowledge that the Collateral is the asset of the Client and is not subject to the claims of any creditors of DC or the Lender." Please let us know if that would accomplish the intended need.

For the pre-payment provision, the Lender can agree to pre-payment at five-year windows, with one-year advance notice and a penalty of 6.0%. Please let us know if that accomplishes the need in that area.

Around April 9, 2003, Mr. Landow executed the following documents with respect to the proposed Derivium loans: (1) A document titled "MASTER AGREEMENT TO PROVIDE FINANCING AND CUSTODIAL SERVICES" (Derivium master agreement), (2) respective schedules A, numbered A-1 through A-6, with respect to the six loans for which his FRNs were to serve as collateral titled "FRN PROPERTY DESCRIPTION AND LOAN TERMS" (Derivium schedules A),[18] and (3) a document titled "SCHEDULE D FRN DISCLOSURE ACKNOWLEDGE-MENT AND BROKER/BANK INDEMNIFICATION" (Derivium schedule D).[19] (We shall refer collectively to the Derivium master agreement, the Derivium schedules A, and the Derivium schedule D as the Derivium transaction documents.) The Derivium master agreement and the Derivium schedules A were also executed by Derivium and Bancroft Ventures Ltd. (Bancroft), a company which was located in

_____

[18]Each of the Derivium schedules A, numbered A-1 through A-6, pertained to the same loan and FRN as the revised proposed schedule A with the same number. See supra note 16.

[19]At no time before Apr. 9, 2003, the date on which Mr. Landow and Derivium entered into the transaction at issue, did Derivium request or require that Mr. Landow complete a loan application or that he provide any personal financial informa-tion.

the Isle of Man and which was the entity that served as the

lender under the Derivium transaction.

The Derivium master agreement provided in pertinent part:

This Agreement is made for the purpose of engaging DC [Derivium] to provide or arrange financing(s) and to provide custodial services to the Client [Mr. Landow], with respect to certain properties and assets ("Properties") to be pledged as security, the details of which financing and Properties are to be set out in loan term sheets and attached hereto as Schedule(s) A ("Schedule(s) A").

       *       *       *       *       *       *       *

3.    **FUNDING OF LOAN**

The contemplated Loan(s) will be funded according to the terms identified in one or more term sheets, which will be labeled as Schedule A, individually numbered and signed by both parties, and, on signing, considered a part of and merged into this Master Agreement. The Client understands that by transferring securities as collateral to DC and under the terms of the Agreement, the Client gives DC and/or its assigns, the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan. The Client agrees to assist the relevant entities in completing all requisite documents that may be necessary to accomplish such transfers.

4.    **RETURN OF CLIENT COLLATERAL**

DC agrees to return, at the end of the loan term, the same collateral (or cash equivalent if the Client's collateral securities have reached their maturity date or the collateral has been called by

the issuer), as set out and defined in Schedule(s) A attached hereto, upon the Client satisfying in full all outstanding loan balances, including all outstanding net interest payments due, if any, and/or all late payment penalties due, if any.

**5.    REGISTRATION AND SUBCUSTODIANS**

DC may place the Client Assets i) with any domestic or foreign depository or clearing corporation or system that provides handling, clearing or safekeeping services; ii) with the issuer of a security in non-certificate form; iii) with any domestic or foreign bank or depository as subcustodian; and DC will pay the fees and expenses of the foregoing entities.

Each of the Derivium schedules A provided in pertinent part:

| | | |
|---|---|---|
| **3.** | **Anticipated Loan Amount:** | 90% of the face value * * * |
| **4.** | **Interest Rate:** | Loan interest rate (LIR) will be indexed to [1 or] 3 month [as the case may be] $US LIBOR ("LIBOR") * * * |
| **5.** | **Interest Payments:** | Interest on the collateral will be received by the Lender and applied against interest due on the Loan, with the result that net interest due per dollar on the Loan will be determined by the * * * Annual Net Interest Rate Formula * * * The * * * formula reduces to the Annual Net Interest Payment/Loan Amount. * * * |
| **6.** | **Late Payment Penalty:** | A late fee of 5% of the Quarterly Net Interest Payment due will be assessed for any Net Interest Payment past due by 30 days or more and will be payable within 60 days of the Net Interest Payment due date. |

7. **Default:** Borrower will be considered in default if any Quarterly Net Interest Payment or late payment penalty is past due by 90 days or more.

\*     \*     \*     \*     \*     \*     \*

10. **Prepayment:** Except as provided for in Paragraph 14, prepayment of the Loan can be made on any date which is a five-year anniversary date of this Loan, provided DC is noticed of this election at least one year prior to a five-year anniversary date and a pre-payment fee of 6.0% of the Loan amount has been paid to DC or the Lender at the time of said election.

11. **Margin Requirement:** None, beyond initial collateral.

12. **Non-Callable:** Loan cannot be called by Lender before maturity as long as Borrower is not considered in Default. If Borrower is in Default, the Loan may be called by Lender at Lender's discretion.

13. **Non-Recourse:** Non-recourse to Borrower, recourse against the Collateral only.

14. **Creditor Claims:** DC and the Lender acknowledge that the Collateral is the asset of the Client and is not subject to the claims of any creditors of DC or the Lender. Should any creditor of DC or the Lender contest the ownership of the Collateral in any court or similar proceeding, DC shall provide immediate notice to the Client and Client shall have the right to prepay the Loan (without any fee) and recover the Collateral provided that the benefit of any transaction entered into by DC or the Lender shall be held by the Client for DC's or the Lender's

benefit and such benefit shall be the only compensation due to DC or the Lender.

The respective Derivium schedules A also provided as follows:

| Schedule No. | Loan Term (in years) | Annual Net Interest Payment Due |
|---|---|---|
| A-1 | 28 | $921.25 |
| A-2 | 28 | 9,480.00 |
| A-3 | 36 | 11,055.00 |
| A-4 | 37 | 9,480.00 |
| A-5 | 38 | 9,322.56 |
| A-6 | 27 | 11,556.09 |

The Derivium schedule D provided in pertinent part:

The Client understands that by transferring securities as collateral to DC and under the terms of the Agreement, the Client gives DC the right, without notice to the Client, to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC has the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan. On repayment of a loan in full by the Client, including all outstanding net interest payments due, if any, and/or all late payment payment [sic] penalties due, if any, DC has the obligation to return to the Client the same collateral (or cash equivalent if the Client's collateral securities have reached their maturity date or the collateral has been called by the issuer), as set out and defined in Schedule(s) A attached hereto.

None of the Derivium transaction documents required Mr. Landow to make any payments against the principal of the loans before maturity of those loans.

On April 14, 2003, Derivium executed a document titled "LETTER OF AGREEMENT" as a supplement to the Derivium transaction

documents (Derivium letter agreement).  That agreement provided that Bancroft was to make certain payments and credits to Mr. Landow to compensate him for (1) the accrued interest on each of his FRNs that remained unpaid on the date of the closing of each of the loans that Bancroft made to him and (2) the interest that Wachovia Securities (Wachovia) was to charge him on certain margin debt associated with the FRN portfolio between the time that he transferred from Citibank to Wachovia that portfolio and that margin debt and the time that he transferred to Bancroft's account with Wachovia that portfolio and that margin debt. Pursuant to the Derivium letter agreement, on May 5, 2003, Bancroft sent Mr. Landow a check in the amount of $4,846.41 as compensation for the interest that Wachovia charged him.

On April 14, 2003, Mr. Landow sent Wachovia a letter in which he gave it instructions with respect to his FRN portfolio and certain transactions that he anticipated undertaking.  That letter stated in pertinent part:

> Landow will deposit into the Account [a certain account that Mr. Landow maintained at Wachovia] on April 16, 2003 the floating rate notes ("FRNs") described below [the FRN portfolio] * * *
>
> Simultaneously with the receipt of an aggregate of $13.5 million * * * hereinafter defined as "Total Loan Proceeds Due" from Bancroft Ventures Limited ("Bancroft"), you are irrevocably authorized and uncon-ditionally instructed to transfer and deliver (in essence, a delivery vs. payment transaction) the above-described FRNs [the FRN portfolio] from the Account to Bancroft * * *

Pursuant to the Derivium loan documents, on April 15, 2003, Mr. Landow instructed Citibank to transfer the FRN portfolio from a certain account that he maintained at Citibank to a certain account that he maintained at Wachovia. Around the same date, Citibank complied with those instructions and transferred the FRN portfolio to Wachovia.

On April 21, 2003, Mr. Landow executed certain documents authorizing Wachovia to transfer each of Mr. Landow's FRNs from his account at Wachovia to a certain account that Bancroft maintained at Wachovia. On the same date, Bancroft sold each of those FRNs.[20] Bancroft realized net sales proceeds of $14,257,180.88 from the sale of the FRN portfolio. At the time Bancroft sold the FRN portfolio, Mr. Landow was not aware of that sale and did not become aware that Bancroft had sold the FRN portfolio until some time after 2003.

On April 22, 2003, Derivium sent Mr. Landow a facsimile. In that facsimile, Derivium informed Mr. Landow (1) that Bancroft had completed certain "hedging transactions" with respect to the FRN portfolio, (2) that the total of the six loans that Bancroft was to make to him was $13.5 million, and (3) that those loans were to close and the proceeds were to be transferred to Mr. Landow on April 24, 2003.

---

[20]Bancroft's sale of each of the FRNs was to settle on Apr. 24, 2003.

On April 24, 2003, Bancroft transferred to Mr. Landow $13.5 million. (We shall refer collectively to the transactions in which Mr. Landow transferred the FRN portfolio to Bancroft and Bancroft transferred to Mr. Landow $13.5 million in cash as the Derivium transaction.) On the same date, Derivium sent Mr. Landow a facsimile in which it informed him that each of the six loans had closed and that the proceeds of those loans totaling $13.5 million had been transferred to his account at Wachovia. On April 24, 2003, Derivium sent Mr. Landow a second facsimile. Derivium included with that facsimile two documents titled "VALUATION CONFIRMATION" and "ACTIVITY CONFIRMATION" (activity confirmation documents), respectively, with respect to each of the FRNs that Bancroft had sold on April 21, 2003. The respective activity confirmation documents listed the principal amounts of the six loans and the total value of the collateral (i.e., the FRNs) transferred to Bancroft with respect to those loans.

After the Derivium transaction was effected, Mr. Landow used a portion of the proceeds that he received as part of that transaction to repay the outstanding balance on the Citibank increased line of credit of $13.5 million.

From around July 2003 through around April 2005, Bancroft sent Mr. Landow the following with respect to each of the six loans that it made pursuant to the Derivium transaction documents: (1) Quarterly account statements reflecting the interest

accrued on the loan, any credits arising from interest accrued on the FRN that served as collateral for the loan, and the net amount of interest due from Mr. Landow for each of the calendar quarters ended June 30 and September 30, 2003, March 31, June 30, September 30, and December 31, 2004, and March 31, 2005 and (2) yearend account statements reflecting interest payments that Mr. Landow made during each of the calendar years 2003 and 2004. From around October 2003 through August 2005, Mr. Landow paid Bancroft for each calendar quarter for which he received an account statement, except the quarter ended June 30, 2003,[21] net interest of $12,953.72.

At a time during 2004 not established by the record, petitioners filed Form 1040, U.S. Individual Income Tax Return (Form 1040), for their taxable year 2003 (2003 joint return). In that return, petitioners claimed, inter alia, a deduction of $167,159 for investment interest paid, including investment interest paid to Citibank and Bancroft of $120,083 and $35,587, respectively. Petitioners attached to the 2003 joint return Schedule D, Capital Gains and Losses (Schedule D), for their taxable year 2003 (2003 Schedule D). In that schedule, petitioners reported for their

---

[21]For the calendar quarter ended June 30, 2003, the interest that accrued on the FRN portfolio during that quarter was greater than the interest that accrued during that quarter on the six loans that Bancroft had made to Mr. Landow. As a result, on July 14, 2003, Bancroft paid Mr. Landow the difference between those amounts.

taxable year 2003 a net short-term capital loss of $1,147,323 consisting of total short-term capital gains of $201,773 and a short-term capital loss carryover from their taxable year 2002 of $1,349,096. In the 2003 Schedule D, petitioners also reported for their taxable year 2003 a net long-term capital loss of $130,290 consisting of a long-term capital loss of $2,187 and a long-term capital loss carryover from their taxable year 2002 of $128,103. Petitioners claimed in the 2003 joint return a capital loss of $3,000 and carried forward the remainder of the loss reported in the 2003 Schedule D (i.e., $1,274,613) to their taxable years 2004, 2005, 2006, and 2007. Petitioners did not report in the 2003 Schedule D or anywhere else in the 2003 joint return any gain with respect to the Derivium transaction.

At a time during 2005 not established by the record, petitioners filed Form 1040 for their taxable year 2004 (2004 joint return). In that return, petitioners claimed, inter alia, a deduction of $45,278 for investment interest paid during that year.[22] Petitioners attached to the 2004 joint return Schedule D for their taxable year 2004 (2004 Schedule D). In that schedule, petitioners reported for their taxable year 2004 a net short-term capital loss of $1,120,292 consisting of total short-term capital

---

[22]Petitioners netted the interest that accrued on Mr. Landow's FRNs against the interest that accrued on the six loans that Bancroft had made to him and included the difference in the investment interest for which they claimed a deduction in the 2004 joint return.

gains of $24,031 and a short-term capital loss carryover from their taxable year 2003 of $1,144,323. In the 2004 Schedule D, petitioners also reported for their taxable year 2004 a net long-term capital loss of $215,987 consisting of total long-term capital losses of $85,697 and a long-term capital loss carryover from their taxable year 2003 of $130,290. Petitioners claimed in the 2004 joint return a capital loss of $3,000 and carried forward the remainder of the loss reported in the 2004 Schedule D (i.e., $1,333,279) to their taxable years 2005, 2006, and 2007. Petitioners did not report in the 2004 Schedule D or anywhere else in the 2004 joint return any gain with respect to the Derivium transaction.

On August 18, 2005, Bancroft sent Mr. Landow a letter in which it informed him that "Optech Limited ('Optech') has acquired your Floating Rate Loan(s) from Bancroft Ventures Limited ('Bancroft') and Optech is now the lender of record for your transaction(s)." That letter also informed Mr. Landow that interest payments due on the six loans, including interest due for the calendar quarter ended June 30, 2005, were to be paid to Optech Ltd. (Optech).

From around August 2005 to around April 2007, Optech sent Mr. Landow the following with respect to each of the six loans that Bancroft had made pursuant to the Derivium transaction documents: (1) Quarterly account statements reflecting the

interest accrued on the loan, any credits arising from interest accrued on the FRN that served as the collateral for the loan, and the net amount of interest due from Mr. Landow for each of the calendar quarters ended June 30, September 30, and December 31, 2005, March 31, June 30, September 30, and December 31, 2006, and March 31, 2007, and (2) yearend account statements reflecting interest payments that Mr. Landow made during each of the calendar years 2005 and 2006. From around August 2005 to around September 2007, Optech sent to Mr. Landow with respect to each of the six loans that Bancroft had made to him an invoice for interest due on the loan for each of the calendar quarters ended June 30, 2005, through September 30, 2007.

Around July 18, 2005, Mr. Landow engaged John W. Moscow (Mr. Moscow), an attorney with the law firm of Rosner, Moscow & Napierala, LLP. Mr. Landow engaged Mr. Moscow to investigate the status of Bancroft and of the FRN portfolio that Mr. Landow had transferred to Bancroft pursuant to the Derivium transaction documents.

On September 19, 2005, Mr. Landow sent Optech a letter in which he requested that Optech provide him with documentation evidencing that Optech had acquired the FRN portfolio from Bancroft and where Optech was holding that portfolio. Mr. Landow did not receive any response from Optech. On each of September 21 and October 25, 2005, and April 13, 2006, Mr. Landow contacted

Optech and restated his request that Optech provide him with documentation evidencing that Optech had acquired the FRN portfolio from Bancroft and where Optech was holding that portfolio. Mr. Landow did not receive any response from Optech.

Mr. Moscow sent Mr. Cathcart, Derivium's founder, separate letters on November 29, 2005 (November 29, 2005 letter), and December 1, 2005 (December 1, 2005 letter), that were addressed to different places regarding the Derivium transaction and certain concerns of Mr. Landow about that transaction.[23] Those letters stated in pertinent part:

> You have been the subject of a recent article in Forbes magazine, as has Derivium Capital LLC and Bancroft Ventures Ltd (IOM). My client, Dr. Landow, is concerned about the custody and control of his securities [the FRN portfolio] * * *. As you know he negotiated a contract different from that proposed to others, and he has every expectation that you will return his securities to him. The sentence in the Forbes article that you sold the stock is therefore extremely disturbing.
>
> We have not received any notice pursuant to paragraph 14 of the Schedule A-4 FRN Property Description and Loan Terms.[24] Given your contractual obligation to return the securities and the absence of such notice it is our expectation that you are in a position to return the securities when obligated to do so.

---

[23]The record does not establish whether Mr. Cathcart sent Mr. Landow or Mr. Moscow any response to the November 29, 2005 letter or the December 1, 2005 letter.

[24]Par. 14 of the "Schedule A-4 FRN Property Description and Loan Terms" required Derivium to notify Mr. Landow in the event that a creditor of Derivium or Bancroft contested ownership of the FRN that was the subject of that schedule.

Because Mr. Landow was unable to confirm that Optech had acquired the FRN portfolio from Bancroft, around March 2006 he opened a bank account with Long Island Commercial Bank in the name of "Jonathan S. Landow FBO Accrued Interest Charges for Floating Rate Note Portfolio" (interest escrow account). In March 2006, Mr. Landow deposited into the interest escrow account $51,814.88, which equaled four quarterly interest payments of $12,953.72 on the six loans that Bancroft had made pursuant to the Derivium transaction documents. Thereafter, and until April 2009, Mr. Landow deposited into the interest escrow account all quarterly interest payments due on the six loans that Bancroft had made pursuant to the Derivium transaction documents.

At a time during 2006 not established by the record, petitioners filed Form 1040 for their taxable year 2005 (2005 joint return). In that return, petitioners claimed, inter alia, a deduction of $109,906 for investment interest paid during that year, including $51,815 that Mr. Landow paid to "BANCROFT & SUCCESSOR" during that year.[25] Petitioners attached to the 2005 joint return Schedule D for their taxable year 2005 (2005 Schedule D). In that schedule, petitioners reported for their taxable year 2005 a net short-term capital loss of $991,991 consisting of

---

[25]Petitioners netted the interest that accrued on Mr. Landow's FRNs against the interest that accrued on the six loans that Bancroft had made to him and included the difference in the investment interest for which they claimed a deduction in the 2005 joint return.

total short-term capital gains of $125,301 and a short-term capital loss carryover from their taxable year 2004 of $1,117,292.  In the 2005 Schedule D, petitioners also reported for their taxable year 2005 a net long-term capital loss of $99,628 consisting of total long-term capital gains of $116,359 and a long-term capital loss carryover from their taxable year 2004 of $215,987.  Petitioners claimed in the 2005 joint return a capital loss of $3,000 and carried forward the remainder of the loss reported in the 2005 Schedule D (i.e., $1,088,619) to their taxable years 2006 and 2007.  Petitioners did not report in the 2005 Schedule D or anywhere else in the 2005 joint return any gain with respect to the Derivium transaction.

At a time during 2007 not established by the record, petitioners filed Form 1040 for their taxable year 2006 (2006 joint return).  In that return, petitioners claimed, inter alia, a deduction of $55,040 for investment interest paid during that year, including $38,860 that Mr. Landow paid with respect to "FRN NOTES" during that year.[26]  Petitioners attached to the 2006 joint return Schedule D for their taxable year 2006 (2006 Schedule D).  In that schedule, petitioners reported for their taxable year 2006 a net short-term capital loss of $1,082,140 consisting

---

[26]Petitioners netted the interest that accrued on Mr. Landow's FRNs against the interest that accrued on the six loans that Bancroft had made to him and included the difference in the investment interest for which they claimed a deduction in the 2006 joint return.

of total short-term capital losses of $93,149 and a short-term capital loss carryover from their taxable year 2005 of $988,991. In the 2006 Schedule D, petitioners also reported for their taxable year 2006 a net long-term capital gain of $378,116 consisting of total long-term capital gains of $477,744 and a long-term capital loss carryover from their taxable year 2005 of $99,628. Petitioners claimed in the 2006 joint return a capital loss of $3,000 and carried forward the remainder of the loss reported in the 2006 Schedule D (i.e., $701,024) to their taxable year 2007. Petitioners did not report in the 2006 Schedule D or anywhere else in the 2006 joint return any gain with respect to the Derivium transaction.

At a time during 2008 not established by the record, petitioners filed Form 1040 for their taxable year 2007 (2007 joint return). In that return, petitioners claimed, inter alia, a deduction of $144,122 for investment interest paid during that year, including $51,815 that Mr. Landow paid with respect to "FRN NOTES" during that year.[27] Petitioners attached to the 2007 joint return Schedule D for their taxable year 2007 (2007 Schedule D). In that schedule, petitioners reported for their taxable year 2007 a net short-term capital gain of $2,522,746 consisting

---

[27]Petitioners netted the interest that accrued on Mr. Landow's FRNs against the interest that accrued on the six loans that Bancroft had made to him and included the difference in the investment interest for which they claimed a deduction in the 2007 joint return.

of total short-term capital gains of $3,226,770 and a short-term capital loss carryover from their taxable year 2006 of $704,024. In the 2007 Schedule D, petitioners also reported for their taxable year 2007 a net long-term capital gain of $312,942 consisting of only long-term capital gains. Petitioners reported in the 2007 joint return a capital gain of $2,835,688 consisting of the net short-term capital gain and the net long-term capital gain that they reported in the 2007 Schedule D. Petitioners did not report in the 2007 Schedule D or anywhere else in the 2007 joint return any gain with respect to the Derivium transaction.

On March 31, 2009, respondent issued to petitioners a notice of deficiency (2003-2004 notice) with respect to petitioners' taxable years 2003 and 2004. In that notice, respondent determined, inter alia, that the Derivium transaction constituted a sale by Mr. Landow of the FRN portfolio with respect to which petitioners are required to recognize a capital gain of $13.5 million.[28]

---

[28]Because of respondent's determination with respect to the Derivium transaction, respondent further determined in the 2003-2004 notice to use the short-term loss carryover and the long-term loss carryover that petitioners claimed in the 2003 Schedule D to offset a portion of the gain that respondent determined resulted from the Derivium transaction. As a result, the capital loss carryforward of $1,274,613 that petitioners claimed in their 2003 joint return was reduced to zero and was not available to carry forward to their taxable years 2004, 2005, 2006, and 2007. However, because, as discussed above, petitioners reported in the 2004 Schedule D long-term capital losses for their taxable year 2004 in excess of short-term capital gains for that year, peti-
(continued...)

On July 6, 2009, respondent issued to petitioners a notice of deficiency with respect to petitioners' taxable years 2005, 2006, and 2007 (2005-2007 notice). In that notice, respondent determined, inter alia, to reduce the respective capital loss carryovers that petitioners had reported in their 2005 joint return, their 2006 joint return, and their 2007 joint return. That determination was based on respondent's determination in the 2003-2004 notice that the Derivium transaction constituted a sale in 2003 by Mr. Landow of the FRN portfolio and that petitioners are required to recognize a capital gain of $13.5 million for their taxable year 2003. As discussed supra note 28, the short-term loss carryover and the long-term loss carryover that petitioners claimed in the 2003 Schedule D were used to offset a portion of the gain that respondent determined resulted from the Derivium transaction. As a result, the capital loss carryover that petitioners claimed in their 2003 joint return was not available to carry forward to any of their taxable years after 2003.

As of around May 2010, Mr. Landow had not paid any of the $13.5 million principal of the six loans that Bancroft had made to him pursuant to the Derivium transaction documents.

---

[28](...continued)
tioners are entitled for their taxable year 2004 to the $3,000 deduction for capital losses that they claimed in their 2004 joint return.

OPINION

Petitioners bear the burden of proving that respondent's determination in the 2003-2004 notice that the Derivium transaction constitutes a sale in 2003 by Mr. Landow of the FRN portfolio is erroneous.[29]  See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

Shortly before the parties filed their respective opening briefs, we decided Calloway v. Commissioner, 135 T.C. 26 (2010). We held on the basis of the facts presented there that a transaction between the taxpayer and Derivium in which the taxpayer transferred to Derivium purportedly as collateral certain securities and Derivium purportedly lent the taxpayer an amount equal to 90 percent of the fair market value of those securities constituted the taxpayer's sale of those securities, and not a loan to the taxpayer of that amount.  In reaching that holding, we found that the taxpayer (1) transferred to Derivium legal title to certain securities that he owned, (2) gave Derivium the right to sell those securities at any time and without notice to the transferor and to retain any and all benefits from any such sale, and (3) left the taxpayer with at best an option to repur-

---

[29]As discussed above, our resolution of the issues presented by respondent's determination in the 2003-2004 notice that the Derivium transaction constitutes a sale in 2003 by Mr. Landow of the FRN portfolio resolves the issues presented by respondent's determinations in the 2005-2007 notice.  See supra notes 2 and 28.

chase the securities at the end of the term of the purported loan in question.  Id. at 34-36.

In resolving the issue presented in Calloway, we relied on various facts relating to the Derivium transaction at issue in that case, including the following:  (1) The taxpayer transferred to Derivium under the agreements that he executed the securities that he owned and gave it an unrestricted right to sell those securities and retain all benefits from any such sale;[30] (2) the purported loan was nonrecourse; (3) except for the securities that the taxpayer transferred to Derivium purportedly as collateral for the purported loan there were no margin requirements; (4) the taxpayer was entitled to credit against the interest that accrued on the purported loan from Derivium any dividends paid on the securities that he transferred to that company; and

---

[30]In Calloway v. Commissioner, 135 T.C. 26, 29 (2010), the agreement between the taxpayer and Derivium provided in pertinent part:

"[Petitioner] understands that by transferring securities as collateral to * * * [Derivium] and under the terms of the * * * [master agreement], * * * [petitioner] gives * * * [Derivium] the right, without notice to * * * [petitioner], to transfer, pledge, repledge, hypothecate, rehypothecate, lend, short sell, *and/or sell outright some or all of the securities* during the period covered by the loan.  * * * [Petitioner] understands that * * * [Derivium] has the right to receive and retain the benefits from any such transactions and that * * * [petitioner] is not entitled to these benefits during the term of a loan. * * * [Emphasis added.]"  [Bracketed insertions, asterisks, and emphasis in Calloway.]

(5) Derivium did not require the taxpayer to make any payment of the principal of the purported loan before maturity. Calloway v. Commissioner, supra at 29, 34-36.

The facts listed above on which we relied in Calloway are present in the instant cases. In the Derivium transaction at issue here: (1) Mr. Landow transferred to Bancroft under the Derivium transaction documents the FRNs that he owned and gave it an unrestricted right to sell those FRNs and to retain all benefits from any such sale;[31] (2) each of the six loans that Bancroft made to Mr. Landow pursuant to the Derivium transaction documents were nonrecourse loans; (3) except for the FRNs that Mr. Landow transferred to Derivium as collateral for the loans that Bancroft made to him there were to be no margin requirements; (4) under each of the Derivium schedules A Mr. Landow was entitled to credit against the interest accrued on each loan the

---

[31]The Derivium master agreement that Mr. Landow executed provided in pertinent part:

> The Client [Mr. Landow] understands that by transferring securities as collateral to DC [Derivium] and under the terms of the Agreement, the Client gives DC and/or its assigns, the right, without requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the securities during the period covered by the loan. The Client understands that DC and/or its assigns have the right to receive and retain the benefits from any such transactions and that the Client is not entitled to these benefits during the term of a loan.

interest accrued on each FRN that he transferred to Derivium;[32] and (5) Derivium and Bancroft did not require Mr. Landow to make any payments of the principal of any of the six loans before maturity.

Petitioners do not dispute that the facts listed above relating to the Derivium transaction at issue here are materially indistinguishable from the facts listed above relating to the Derivium transaction at issue in <u>Calloway v. Commissioner</u>, <u>supra</u>. Petitioners argue, however, that there are certain other facts in the present cases that make the Derivium transaction at issue here materially distinguishable from the Derivium transaction at issue in <u>Calloway</u>. Therefore, petitioners maintain, <u>Calloway</u> does not control the resolution of whether the Derivium transaction at issue here constitutes a sale by Mr. Landow of his FRN portfolio.[33]

---

[32]We do not find it material that in the present cases Mr. Landow was required by the Derivium transaction documents to pay quarterly to Bancroft the net difference between the interest accrued on each of the six loans that Bancroft made to him pursuant to those documents and the interest accrued on each of the FRNs that he transferred to Bancroft, whereas in <u>Calloway v. Commissioner</u>, <u>supra</u> at 29, the taxpayer was required to pay interest only at the end of the three-year loan term.

[33]Petitioners also contend that the Derivium transaction is materially indistinguishable from the Citibank transaction which respondent acknowledges constituted a loan by Citibank to Mr. Landow that was collateralized by the FRN portfolio. Because of respondent's acknowledgment that the Citibank transaction constituted a loan to Mr. Landow and because petitioners maintain that the Citibank transaction and the Derivium transaction are materi-
(continued...)

Petitioners point out that in the Derivium transaction at issue here, unlike in the Derivium transaction at issue in Calloway, (1) Mr. Landow did not enter into the Derivium transaction for the purpose of minimizing his risk of loss with respect to the FRN portfolio and monetizing the value of that portfolio without paying tax on the proceeds; (2) at all times petitioners treated the Derivium transaction as a loan; and (3) Mr. Landow "never surrendered his FRNs to Derivium or its affiliates, and has taken significant steps to locate and recover the FRNs" in contrast to the taxpayer in Calloway who "voluntarily surrendered his collateral at the expiration of the three-year loan term".[34]

---

[33](...continued)
ally the same, petitioners assert (1) that the Derivium transaction constitutes six loans by Bancroft to Mr. Landow that were collateralized by the FRN portfolio or (2) that the Citibank transaction constituted a sale in 2000 by Mr. Landow of the FRN portfolio. On the record before us, we reject petitioners' contentions. On that record, we find the Citibank transaction to be materially distinguishable from the Derivium transaction.

[34]With respect to the third alleged difference between these cases and Calloway v. Commissioner, supra, it appears that petitioners are contending that Mr. Landow did not abandon his obligations under the Derivium transaction documents and therefore did not allow Bancroft to retain the FRNs that he transferred to it. However, the six loans that Bancroft made to Mr. Landow had terms ranging from 27 to 38 years, and none of those loans had reached maturity as of the time that the parties submitted these cases under Rule 122. More importantly, because those six loans were nonrecourse loans, Mr. Landow, like any other nonrecourse borrower, had the right to "walk away" from his obligations to repay those loans and to allow the lender to retain the FRNs that he had transferred to it.

Petitioners are correct that none of the above-listed facts were present in Calloway v. Commissioner, 135 T.C. 26 (2010). However, those facts were present in Shao v. Commissioner, T.C. Memo. 2010-189, and/or Kurata v. Commissioner, T.C. Memo. 2011-64,[35] two cases in which we held that Calloway was controlling and that the respective transactions at issue in those cases constituted sales of securities by the respective taxpayers, and not loans to those respective taxpayers.[36]

In Shao v. Commissioner, supra, there was no evidence that the taxpayer entered into the transaction for the purpose of monetizing her securities without paying tax on the proceeds. Id. In fact, the taxpayer in Shao entered into the Derivium transaction at issue in that case in order to replace a certain margin account that she had maintained with a certain financial institution. Id. Moreover, the taxpayer in Shao treated her transaction as a loan at all times and did not "voluntarily surrender" at the end of the term of her purported loan the securities that she had transferred to Derivium as purported

[35]We decided Shao v. Commissioner, T.C. Memo. 2010-189, and Kurata v. Commissioner, T.C. Memo. 2011-64, on the same day or after the day the parties filed their respective reply briefs.

[36]On brief, petitioners cite repeatedly the concurring opinion of Judge Holmes in Calloway v. Commissioner, 135 T.C. at 53, as support for certain of their arguments. We note that Judge Holmes was the author of our opinion in Shao v. Commissioner, supra, which held Calloway to be controlling.

collateral for that purported loan.  Id.  Although the taxpayer in Shao, like any other nonrecourse borrower, had the right to "walk away" from the purported loan at the conclusion of the three-year term of that purported loan, she chose to pay a significant renewal fee in order to extend the term of the purported loan.  Id.  Despite the foregoing factual differences from Calloway v. Commissioner, supra, we held in Shao that Calloway was controlling and that the Derivium transaction at issue in Shao constituted a sale of securities by the taxpayer, and not a loan to the taxpayer by Derivium.  Shao v. Commissioner, supra.

In Kurata v. Commissioner, supra, there also was no evidence that the taxpayers entered into the Derivium transaction at issue there for the purpose of monetizing their securities without paying tax on the proceeds.  Id.  Moreover, the taxpayers in Kurata treated the transaction as a loan during the term of that purported loan and reported gain from the sale of the securities when they chose to surrender those securities at the conclusion of the three-year term of the purported loan.  Id.  Despite these factual differences from Calloway, we held in Kurata that Calloway was controlling and that the Derivium transaction at issue in Kurata constituted a sale of securities by the taxpayers, and not a loan to the taxpayers by Derivium.  Kurata v. Commissioner, supra.

Petitioners also point to certain other facts that they contend make the Derivium transaction at issue here materially distinguishable from the Derivium transaction at issue in Calloway, including the following:  (1) Mr. Landow retained the ability to prepay the loan principal under the Derivium transaction documents and (2) those documents provided that the FRN portfolio continued to be an asset of Mr. Landow.[37]

With respect to the provision in the Derivium transaction documents involved here that gave Mr. Landow the right to prepay the loan principal, which the taxpayer in Calloway did not have, that right of Mr. Landow was extremely limited.  He had the right to prepay the loan principal only once every five years and only after having given Derivium and Bancroft one-year advance notice. The purported loan at issue in Calloway was for a term of three years, Calloway v. Commissioner, supra, which was two years less than the earliest point at which Mr. Landow was able to prepay the principal of his loan.  Moreover, another condition to Mr. Landow's ability to prepay the loan principal was the requirement that he pay at the time he gave the required notice a fee of 6 percent of the loan principal, which equaled $810,000--a signifi-

_____

[37]As noted supra note 35, we decided Shao v. Commissioner, supra, and Kurata v. Commissioner, supra, on the same day or after the day the parties filed their respective reply briefs. If those two cases had been released before the parties filed their respective briefs, we presume that petitioners would have pointed out that the facts listed below were not present in those cases.

cant disincentive to Mr. Landow's exercising his prepayment right.

With respect to the provision in the Derivium transaction documents that the FRN portfolio was to remain the asset of Mr. Landow, we find that provision to be meaningless. This is evidenced by the fact that on the same date on which Mr. Landow transferred the FRNs to Bancroft, Bancroft sold those FRNs, which it was expressly allowed to do in those documents, and used 90 percent of the sale proceeds to make the six loans in question to Mr. Landow.

Based upon our examination of the entire record before us, we find that the Derivium transaction at issue here is not materially distinguishable from the Derivium transaction at issue in Calloway v. Commissioner, supra. On that record, we further find that Calloway is controlling in these cases. On the record before us, we find that the Derivium transaction constitutes a sale by Mr. Landow of the FRN portfolio to Bancroft, and not a loan by Bancroft to Mr. Landow that was collateralized by that portfolio.

We turn now to petitioners' argument that if we were to find, as we have, that the Derivium transaction at issue here constitutes a sale by Mr. Landow of the FRNs, they would not be required under section 1042(e) to recognize any gain that Mr. Landow realized as a result of that sale. That is because,

according to petitioners, gain under that section is recognized only where the taxpayer disposes of qualified replacement property (i.e., the FRN portfolio), and Mr. Landow did not dispose of the FRN portfolio; Derivium did.

Petitioners' argument misreads our Opinion in Calloway v. Commissioner, 135 T.C. 26 (2010). In Calloway, an important fact was that Derivium sold the taxpayer's stock immediately after the taxpayer transferred it to Derivium. Id. at 34-36, 38-39. That fact, combined with other facts, led us to hold in Calloway that the taxpayer sold his stock when he transferred it to Derivium. Id. at 39. We did not hold in Calloway, as petitioners suggest, that Derivium's immediate sale of the taxpayer's stock constituted the sale with respect to which the taxpayer was subject to tax. Id. In making their argument under section 1042(e), petitioners are focusing on the wrong transaction, namely, Bancroft's immediate sale of the FRNs. The transaction on which we must focus to address petitioners' argument under section 1042(e) is Mr. Landow's disposition by sale of the FRNs to Bancroft.

On the record before us, we have found that Mr. Landow sold the FRN portfolio when he transferred that portfolio to Bancroft pursuant to the Derivium transaction documents. On that record, we further find that petitioners are required under section

1042(e) to recognize for their taxable year 2003 any gain that Mr. Landow realized as a result of that sale.

Petitioners also argue that if we were to find, as we have, that the Derivium transaction constitutes a sale by Mr. Landow of the FRNs, that sale would constitute a theft and therefore an involuntary conversion under section 1033(a).[38]  Consequently,

---

[38]Sec. 1033(a) provides in pertinent part:

SEC. 1033.  INVOLUNTARY CONVERSIONS.

(a) General Rule.--If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted--

   *     *     *     *     *     *     *

(2) Conversion into money.--Into money or into property not similar or related in service or use to the converted property, the gain (if any) shall be recognized except to the extent hereinafter provided in this paragraph:

(A) Nonrecognition of gain.--If the taxpayer during the period specified in subparagraph (B), for the purpose of replacing the property so converted, purchases other property similar or related in service or use to the property so converted, or purchases stock in the acquisition of control of a corporation owning such other property, at the election of the taxpayer the gain shall be recognized only to the extent that the amount realized upon such conversion (regardless of whether such amount is received in one or more taxable years) exceeds the cost of such other property or such stock.  Such election shall be made at such time and in such manner as the Secretary may by regulations prescribe. * * *

according to petitioners, they are entitled to purchase replacement property as required by section 1033(a)(2)(A) and thereby defer under section 1033(a) any gain that Mr. Landow realized as a result of that sale.

In Wheeler v. Commissioner, 58 T.C. 459 (1972), we explained the scope and the purpose of section 1033 as follows:

> Congress clearly intended to extend the benefits of section 1033 * * * only to public takings and casualty-like conversions, and the limitation of its benefits to involuntary conversions--i.e., those "wholly beyond the control of the one whose property has been taken"-- reflects that intent.

Id. at 463 (quoting Dear Publ. & Radio, Inc. v. Commissioner, 274 F.2d 656, 660 (3d Cir. 1960), affg. 31 T.C. 1168 (1959)).

Mr. Landow voluntarily entered into the Derivium transaction in which he transferred to Bancroft the FRN portfolio in exchange for $13.5 million in cash and gave Bancroft the right, inter alia, to sell the FRN portfolio without notice to him and to retain the proceeds of that sale.

On the record before us, we find that Mr. Landow's sale of the FRN portfolio to Bancroft in exchange for $13.5 million in cash does not constitute an involuntary conversion, as defined in section 1033. On that record, we further find that petitioners are not entitled to defer under that section any gain that Mr. Landow realized as a result of that sale.[39]

---

[39]In the light of our finding that petitioners are not
(continued...)

We have considered all of the contentions and arguments of the parties that are not discussed herein, and we find them to be without merit, irrelevant, and/or moot.

To reflect the foregoing and the concessions of the parties,

<u>Decisions will be entered</u>

<u>under Rule 155</u>.

---

[39](...continued) entitled to defer under sec. 1033 any gain that Mr. Landow realized as a result of his sale of the FRNs, we need not and shall not address petitioners' argument that they are entitled to an extension of the period under sec. 1033(a)(2)(B) within which they must purchase replacement property.