T.C. Memo. 2011-78

UNITED STATES TAX COURT

KURT SOLLBERGER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 9458-08.                    Filed April 4, 2011.

<u>Brian G. Isaacson</u>, for petitioner.

<u>Daniel J. Parent</u>, for respondent.

MEMORANDUM OPINION

KROUPA, <u>Judge</u>:  This matter is before the Court on respondent's motion for summary judgment and petitioner's cross-motion for partial summary judgment, each filed under Rule 121.[1] Petitioner transferred floating rate notes (FRNs) to Optech Ltd.

---

[1]All Rule references are to the Tax Court Rules of Practice and Procedure, and all section references are to the Internal Revenue Code in effect for 2004, unless otherwise indicated.

(Optech) in exchange for cash in 2004. We must decide whether petitioner's transfer to Optech was a nonrecourse loan or a sale. We hold that petitioner's transfer was a sale. Accordingly, we shall grant respondent's motion for summary judgment and deny petitioner's cross-motion for partial summary judgment.

## Background

Petitioner was president and owner of Swiss Micron, Inc. (Swiss Micron), a high-precision-component manufacturing company in Rancho Santa Margarita, California. Swiss Micron adopted the Swiss Micron Employee Stock Ownership Plan (ESOP) in 1999, and petitioner subsequently sold 340 shares of Swiss Micron stock to the ESOP for $1,032,240 in 2000 (ESOP stock sale). Petitioner could defer recognition of capital gain on the ESOP stock sale pursuant to section 1042, provided he invested the proceeds in qualified replacement property (QRP). Petitioner elected to defer recognition of the gain by using the ESOP stock sale proceeds to purchase 1,000 FRNs from Bank of America for $1,000 each. The FRNs qualified as QRP, and petitioner therefore could defer recognizing gain from the ESOP stock sale until he sold the FRNs. See sec. 1042(e).

FRNs are debt securities with a variable interest rate tied to a money market index. The fair market value of an FRN generally equals the note's face value because the interest paid on the note will vary over time. Here, the interest rate

adjusted quarterly and was tied to the London Interbank Offered Rate (LIBOR).

In 2004 petitioner met representatives of Optech. Optech, an affiliate of Derivium Capital, LLC (Derivium),[2] promoted and marketed an ESOP-QRP loan program to petitioner.[3] The ESOP-QRP loan program required petitioner to pledge the FRNs to Optech as collateral in exchange for 90 percent of the value of the FRNs. The loan would be nonrecourse. This meant petitioner would not be entitled to the return of the FRNs if he did not repay at the end of the loan term. Optech could keep the FRNs if petitioner did not repay the loan but could not sue for any unpaid balance on the loan. Optech told petitioner that the ESOP-QRP loan program allowed petitioner to defer tax on the proceeds from the ESOP stock sale as well as allow him to cash in on 90 percent of the value of his FRNs immediately.

Petitioner relied on the representations Optech made and decided to enter into the loan agreement with Optech. Petitioner

---

[2]Derivium, its affiliates and its customers have been involved in numerous civil and criminal cases relating to Derivium's 90-percent ESOP-QRP loan program and 90-percent-stock-loan program. See, e.g., Calloway v. Commissioner, 135 T.C. 26 (2010); United States v. Cathcart, No. C 07-4762 (N.D. Cal. filed Sept. 17, 2007); Derivium Capital LLC v. U.S. Tr., 97 AFTR 2d 2006-2582 (S.D.N.Y. 2006). Derivium eventually went bankrupt and is widely reported to have been involved in a Ponzi scheme. Shao v. Commissioner, T.C. Memo. 2010-189.

[3]We use the terms "loan," "collateral," "borrow," "lend," "hedge" and "maturity" with all related terms throughout this opinion merely for convenience, not as legal definitions.

signed two documents. One was entitled "Schedule A-1, Loan Schedule" (Schedule A-1), and the other was entitled "Master Loan Financing and Security Agreement" (MLSA). Schedule A-1 set forth the essential terms of the transaction. It listed the total face value of all FRNs at $1 million. It further stated that the loan term was 7 years, there was no margin requirement and the loan was noncallable and nonrecourse. Schedule A-1 indicated that the lender would receive the interest on the collateral and would apply the interest on the loan so only "net interest" would be due.

Optech agreed under the MLSA to serve as the lender or as agent for another lender. The MLSA provided that petitioner, as the borrower, remained the beneficial owner of the FRNs posted as collateral during the term of the loan and the FRNs would not be subject to the claims of any of Optech's creditors. The MLSA stated, however, that the lender had the right to register the FRNs in the lender's name, and Optech could "assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber short sell and/or sale" the FRNs during the term of the loan without notifying petitioner. Moreover, petitioner waived his rights in the MLSA to receive interest and other benefits from the FRNs during the term of the loan, and he could not prepay on the loan.

Petitioner instructed his bank, California Bank & Trust, to transfer his FRNs to a Morgan Keegan bank account (Morgan Keegan account) on behalf of Optech, per their agreement. Optech then mailed petitioner a "Valuation Confirmation" indicating that Optech had received the FRNs into the Morgan Keegan account valued at $1 million. The "Valuation Confirmation" also stated that Optech advanced petitioner $293,274.21 on the loan. Two days after Optech received the FRNs, an agent of Optech sold the FRNs for $961,293.33, which was less than the $1 million fair market value, and deposited the proceeds into the Morgan Keegan account. Optech transferred the remaining $606,725.79 of the loan to petitioner's personal bank account at Wells Fargo on August 2, 2004.

Optech provided petitioner with quarterly and year-end account statements over the 7-year term of the loan. The statements purported to reflect the interest accrued, the balance of the loan and the value of the FRNs. Optech prepared the statements to make it appear that it still held the securities and that the transactions were legitimate.

Petitioner timely filed a Federal income tax return for 2004. Petitioner failed to report any of the previously deferred gain from the ESOP stock sale in 2004 because he treated the transaction with Optech as a loan, not a sale. Respondent examined petitioner's return for 2004, determined that

petitioner's transaction with Optech was a sale rather than a loan and determined a $128,979 deficiency in petitioner's Federal income tax for 2004. Petitioner timely filed a petition with this Court arguing that the Optech transaction was a loan, not a sale.

## Discussion

Respondent asks that we find as a matter of law that petitioner sold the FRNs to Optech in 2004. Petitioner counters that the transfer of the FRNs was a loan, not a sale, to Optech, and Optech's decision to sell the stock was improper. He asserts that under the MSLA he retained the benefits and burdens of ownership as well as the right to their return. Petitioner asks that we find that the MLSA is an enforceable contract obligating the return of the FRNs upon demand. We begin by discussing the standard for summary judgment.

### Summary Judgment

Summary judgment is intended to expedite litigation and avoid unnecessary and expensive trials. See, e.g., FPL Group, Inc. & Subs. v. Commissioner, 116 T.C. 73, 74 (2001). Either party may move for summary judgment upon all or any part of the legal issues in controversy. Rule 121(a). The Court may grant summary judgment on a matter concerning which there is no genuine issue as to any material fact and a decision may be rendered as a matter of law. See Rule 121(b); Elec. Arts, Inc. v.

<u>Commissioner</u>, 118 T.C. 226, 238 (2002).  The moving party has the burden of proving that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law. <u>Rauenhorst v. Commissioner</u>, 119 T.C. 157, 162 (2002).

Here, the issue is whether the incidents of ownership of the FRNs transferred from petitioner to Optech.  This is a question of fact established by the written agreement read in the light of the attending facts and circumstances.  See <u>Calloway v. Commissioner</u>, 135 T.C. 26, 33 (2010).  Respondent relies upon the MLSA and the Schedule A-1 to show that the benefits and burden of ownership passed from petitioner to Optech.  See <u>id.</u>  The parties do not dispute the authenticity or terms of the MLSA or the Schedule A-1 or whether petitioner transferred FRNs to Optech in exchange for $900,000.  We find that whether ownership passed from petitioner to Optech can be determined by examining the MLSA and the Schedule A-1.  Accordingly, there is no genuine issue of material fact for trial, and a decision may entered as a matter of law.

<u>Sale Versus Loan</u>

The parties dispute whether petitioner's transaction with Optech was a loan or a sale.  Courts have defined a loan as an express or implied agreement where one person advances money to the other and the other agrees to repay it upon such terms as time and rate of interest.  <u>Welch v. Commissioner</u>, 204 F.3d 1228,

1230 (9th Cir. 2000), affg. T.C. Memo. 1998-221.  There must be an unconditional obligation on the part of the transferee to repay the money, and an unconditional intention on the part of the transferor to secure repayment.  Haag v. Commissioner, 88 T.C. 604, 615-616 (1987), affd. without published opinion 855 F.2d 855 (8th Cir. 1988).  Accordingly, there must be a bona fide debtor-creditor relationship for the transaction to be characterized as a loan.

We recently decided two factually similar cases involving Optech's affiliate, Derivium.  See Calloway v. Commissioner, supra; Shao v. Commissioner, T.C. Memo. 2010-189.  The transactions in Calloway and Shao mirrored the ESOP-QRP loan program at issue, except that they used marketable shares instead of FRNs.  Like petitioner, the taxpayers transferred easily marketable assets to Derivium under its 90-percent-stock-loan program.  Moreover, the taxpayers and Derivium entered into MLSAs and loan schedules with terms substantially identical to the agreements in this case.  In Calloway, for instance, we considered the substance of the transaction, not merely its form, to determine whether the benefits and burdens of stock ownership passed from the taxpayer to Derivium.  Derivium did not hold the stock as collateral, but rather immediately sold it and, based on the sale price, passed 90 percent of the proceeds to the taxpayer.  Based on a number of factors, we found that the

taxpayer transferred all rights and privileges of ownership to Derivium and held that the transfer of stock to Derivium was a sale.  <u>Calloway v. Commissioner</u>, <u>supra</u>.

There is no factual difference here from either <u>Calloway</u> or <u>Shao</u>.  The benefits and burdens of the FRNs passed from petitioner to Optech.  Optech did not hold the FRNs as collateral.  Instead, Optech immediately sold the FRNs and, based on the sale price, passed 90 percent to petitioner.  We conclude that petitioner sold his FRNs to Optech, thereby triggering capital gain in 2004 from the ESOP stock sale.

We have considered all arguments made in reaching our decision, and, to the extent not mentioned, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order granting</u>
<u>respondent's motion for summary</u>
<u>judgment and denying petitioner's</u>
<u>cross-motion for summary judgment</u>
<u>and decision will be entered for</u>
<u>respondent</u>.