T.C. Memo. 2012-228

UNITED STATES TAX COURT

GREGORY RAIFMAN AND SUSAN RAIFMAN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 12144-11L.　　　　　　　　Filed August 7, 2012.

<u>Brian G. Isaacson</u> and <u>Emily J. Kingston</u>, for petitioners.

<u>Daniel J. Parent</u>, for respondent.

MEMORANDUM OPINION

WELLS, <u>Judge</u>:  This case is before the Court on respondent's motion for
summary judgment pursuant to Rule 121.[1]  Petitioners ask us to review the

---

[1]Unless otherwise indicated, section references are to the Internal Revenue
Code of 1986, as amended, and Rule references are to the Tax Court Rules of
Practice and Procedure.

[*2] determination of respondent's Appeals Office to proceed with collection actions with respect to petitioners' 2003 tax liability. The parties agree that the only disputed issue is whether petitioners are entitled to a deduction for a theft loss for their 2006 tax year that can be carried back to eliminate their 2003 tax liability.

Background

The facts set forth below are based upon examination of the pleadings, moving papers, responses, and attachments, and they are not in dispute. Petitioners resided in California at the time they filed their petition.

During 2003, petitioners' financial adviser, Joe Ramos of Private Consulting Group, provided them with information about Derivium Capital, LLC (Derivium), a South Carolina entity owned and controlled by Charles Cathcart and Yuri Debevc. Derivium[2] offered a program called the "90% Stock Loan", which Derivium marketed to high-net-worth individuals with large equity investments.[3]   As explained in Derivium's marketing materials, the 90% Stock Loan permitted

---

[2]As noted below, petitioners signed agreements with two entities related to Derivium. For convenience, unless we indicate that we are discussing the specific terms of those agreements, we will refer to all of the entities involved in the 90% Stock Loan program as Derivium.

[3]Although we refer to the Derivium program as the "90% Stock Loan" and sometimes use terms such as "loan", "collateral", "loan term", "maturity", etc., we use those terms for convenience only. We do not intend our use of those terms to imply that the transaction constituted a loan for tax purposes.

[*3] investors to receive cash in the amount of 90% of the value of any stock the investors transferred to Derivium. Derivium would then "establish hedging transactions to protect the value" of the stock. The principal and interest on the 90% Stock Loan would not be due until maturity, after a term of at least three years. Derivium characterized the 90% Stock Loan as a nonrecourse loan and claimed that it offered investors the opportunity to generate liquidity without triggering a taxable event and to hedge against a market downturn while retaining the benefits of any market gains.

On August 5, 2003, petitioners signed a Master Loan Agreement and blank schedule A-1 with WITCO, Ltd. (WITCO), an entity that Derivium told petitioners was a foreign lender. WITCO was owned and controlled by Mr. Cathcart and Mr. Debevc. The Master Loan Agreement stated:

> The Client understands that by transferring custody of the Collateral to WITCO as agent for the Lender under terms of this Agreement and Schedule(s) A, the Client grants to the Lender and its agent, WITCO, the right and power, without the requirement of notice to or consent of the Client, to assign, transfer, pledge, repledge, hypothecate, rehypothecate, lend, encumber, short sell, and/or sell outright some or all of the Collateral during the Loan Term (as defined in Schedule(s) A). * * *
>
>       *       *       *       *       *       *       *
>
> WITCO and the Lender unconditionally agree to return to the Client, at the end of the Loan Term, the same Collateral received for such Loan, as such Collateral is listed and described in the associated Schedule A, so long as

**[*4]** the Client has then satisfied in full all outstanding Loan obligations to the Lender, including the payment of interest accrued on the Loan. If the Collateral is stock, the Collateral to be returned to the Client as per this paragraph shall reflect any and all stock splits, conversions, exchanges, mergers, or other dividends and distributions, except dividends paid on the Collateral that are to be credited toward interest due under the Loan to the Client, as provided in Schedule A.

During early September 2003, petitioners signed another schedule A-1 that listed information about the collateral, loan amount, and loan term. The schedule A-1 defined the "Loan Term" as three years from the date the loan proceeds are distributed. Additionally, it stated that the estimated value of the collateral was $2,537,600, that the loan amount would be 90% of that value, and that the interest rate would be 11.25%, compounded annually and due at maturity. Petitioners renewed the loan on the maturity date, but if the value of the collateral on that date did not equal or exceed 90% of the payoff amount, petitioners would have to pay additional interest at the time of renewal.

On August 19, 2003, petitioners authorized the transfer of 320,000 shares of ValueClick stock from their account to WITCO's account. WITCO received the shares of ValueClick stock in two installments: 159,000 and 161,000 shares on August 28 and September 22, 2003, respectively. On August 28 and 29, 2003, WITCO sold 159,000 shares of ValueClick stock. The transfer and sale of petitioners' shares of ValueClick stock was conducted through WITCO's account

[*5] at Wachovia Securities, LLC (Wachovia). On a date not disclosed in the record but before September 22, 2003, WITCO distributed $1,260,410.52 to petitioners. On September 22, 2003, WITCO sold 161,000 shares of ValueClick stock. On September 29, 2003, WITCO distributed $1,362,804.48 to petitioners.

During 2004, petitioners entered into two more 90% Stock Loan transactions with entities related to Derivium. On July 6, 2004, through their wholly owned entity Helicon Investments, Ltd. (Helicon), petitioners signed a Master Loan Agreement with Optech, Ltd. (Optech). The terms of that Master Loan Agreement were identical to the terms of the WITCO Master Loan Agreement in all material respects. The estimated value of the collateral was $3,540,000, the anticipated loan amount was 86% of the value of the collateral,[4] the loan term was three years, and the interest rate for the loan was 11.75%, compounded annually and due at maturity. On or about July 9, 2004, Helicon transferred 300,000 shares of ValueClick stock to Optech's Wachovia account. In a series of sales on July 9, 12, 13, 14, 15, and 16, 2004, Optech sold 300,000 shares of ValueClick stock. On July 23, 2004, Optech transferred $2,810,475.60 into Helicon's bank account.

---

[4]It is unclear from the record why the anticipated loan amount was only 86% of the value of the collateral instead of 90%.

[*6] During November 2004, petitioners, through their wholly owned entity Gekko Holdings, LLC (Gekko), entered into another Master Loan Agreement with Optech. The terms of that Master Loan Agreement are not disclosed in the record,[5] but the parties agree that they were identical in all material respects to the terms of the other two 90% Stock Loan transactions. On November 19, 2004, petitioners authorized the transfer of 200,000 shares of ValueClick stock from Gekko to Optech. Those shares were transferred to Optech's Wachovia account on November 23, 2004. On November 24, 26, 29, and 30, 2004, Optech sold 200,000 shares of ValueClick stock. On November 30, 2004, Optech provided Gekko with an "Activity Confirmation" statement reporting that the total value of Gekko's collateral was $2,400,299.83 and the amount of the 90% Stock Loan was $2,160,269.85. The statement noted that the loan term was three years and that the interest rate on the loan was 11.75%. On December 2, 2004, Optech transferred $2,160,266.92 in cash to Gekko.

During the terms of the loans, Optech sent petitioners quarterly and yearly account statements reporting the balance of the loans, the accrued interest, and the current value of the underlying collateral. Petitioners were not obligated to make

---

[5]The record contains two copies of the July 6, 2004, Master Loan Agreement. It appears that respondent mistakenly produced two copies of that agreement instead of a copy of the November 2004 agreement.

[*7] payments during the term of the loans, and they did not make any payments with respect to either the principal of or the interest on the loans. During the term of each of the loans, the share price of ValueClick stock increased so that the value of petitioners' underlying collateral greatly exceeded the amount of the principal and interest on each loan.

On August 10, 2006, petitioners completed an Optech form electing to renew or refinance their September 29, 2003, loan for another term of three years.[6] Petitioners received no response from Optech. On October 17, 2006, Carin Levine, the general counsel for petitioners' investment adviser Private Consulting Group, sent Optech a letter demanding the return of 320,000 shares of ValueClick stock that had been pledged as collateral for petitioners' September 29, 2003, loan. Petitioners again received no response from Optech. On November 21, 2006, Ms. Levine initiated arbitration proceedings against Optech on behalf of petitioners.

After September 29, 2006 and before the end of the calendar year, petitioners initiated an investigation of Optech, WITCO, Derivium, and Messrs. Cathcart and Debevc. Petitioners discovered that Derivium had been sued by a number of other borrowers and that it had filed for bankruptcy during 2005.

---

[6]The September 29, 2003, loan was made by WITCO; it is unclear from the record how Optech came to hold the loan.

**[*8]** Additionally, during the course of their 2006 investigation, petitioners learned that the California Corporations Commission had filed suit against Derivium to enjoin it from engaging in the 90% Stock Loan program. After learning these facts during late 2006, petitioners reported to the Federal Bureau of Investigation that Derivium had stolen their ValueClick stock.

Petitioners did not report the Derivium transactions or the funds received from Derivium on their 2003 or 2004 return. Petitioners filed an amended tax return for their 2006 tax year, claiming a theft loss of $7,593,956 from "the illegal sale of 820,000 shares of ValueClick stock sold without their knowledge or permission". That amount was equal to their basis in the shares of ValueClick stock, the fair market value of which, at the time the alleged theft was allegedly discovered during late 2006, petitioners reported to be $17,716,000. Because their claimed theft loss was so large, petitioners also filed an amended tax return for their 2003 tax year, claiming a theft loss carryback of $5,386,786.

During September 2007, petitioners filed an arbitration demand against their financial advisers, Joe Ramos and Private Consulting Group, for breach of contract, breach of fiduciary duty, professional negligence, and constructive fraud in connection with the 90% Stock Loan. However, petitioners recovered from their financial advisers only what they characterized as a "paltry sum", the amount

**[*9]** of which is not disclosed in the record. Petitioners also attempted to recover from Wachovia and one of Wachovia's financial advisers. On July 19, 2010, petitioners filed a Financial Industry Regulatory Authority arbitration claim against Wachovia, asserting: (1) fraud, concealment, and conspiracy to commit fraud; (2) breach of fiduciary duty; (3) breach of contract; (4) aiding and abetting fraud and breach of fiduciary duty; (5) violation of the California Securities Act; (6) violation of National Association of Securities Dealers and New York Stock Exchange rules; and (7) conversion. See Wachovia Sec., LLC v. Raifman, No. C 10-04573 SBA, 2010 WL 4502360 (N.D. Cal. Nov. 1, 2010). Petitioners were unsuccessful in that claim. See id.

Respondent examined petitioners' 2003 tax return and disallowed certain business expense deductions related to a horse breeding business. Petitioners entered a closing agreement with respondent during February 2009 with respect to their 2003 tax liability. Additionally, petitioners consented to the assessment and collection of their 2003 tax liability.[7]

---

[7]As part of his examination, respondent also determined that the 2003 90% Equity Loan should have been treated as a sale of 320,000 shares of ValueClick stock and that petitioners owed tax on the capital gain from the sale. Although petitioners therefore have had a prior opportunity to dispute the characterization of their 2003 transaction with Derivium, because most of the purported theft loss stems from the 2004 transactions respondent does not contend that petitioners are

(continued...)

**[*10]**  On August 3, 2009, respondent issued petitioners a notice of intent to levy with respect to their 2003 tax liability.  On August 12, 2009, petitioners submitted a Form 12153, Request for a Collection Due Process (Levy) Hearing.  On October 1, 2009, respondent mailed to petitioners a Notice of Federal Tax Lien Filing and Your Right to a Hearing Under IRC 6320.  On October 30, 2009, petitioners submitted a Form 12153, Request for a Collection Due Process (Lien) Hearing.  The explanation on the Form 12153 with respect to the levy action stated that the "2003 liability will be eliminated by a carryback", and the explanation on the Form 12153 with respect to the lien stated:  "The 2003 tax liability will be extinguished by an NOL".

On October 22, 2010, petitioners received a letter from Theresa Amper with respondent's Appeals Office.  Before the hearing, petitioners' counsel Emily J. Kingston provided Ms. Amper with copies of petitioners' amended 2003 and 2006 tax returns showing the claimed theft loss.  On November 16, 2010, Ms. Amper conducted the hearing with Ms. Kingston and determined that the matter should be assigned to another settlement officer to determine whether to allow the theft loss

---

[7](...continued)
precluded, on the basis of their waiver with respect to their 2003 tax liability, from disputing the characterization of the underlying transaction.

**[*11]** deduction claimed on petitioners' amended 2006 return and the corresponding carryback on their amended 2003 return.

After that settlement officer returned the matter to Ms. Amper, she conducted another hearing with Ms. Kingston on February 11, 2011. During the hearing, Ms. Kingston contended that Ms. Amper should suspend the collection actions while respondent considered the theft loss deduction claimed on petitioners' amended 2006 return. However, Ms. Amper declined to consider the theft loss carryback and determined that it was appropriate to sustain the lien and levy; and on April 19, 2011, respondent's Appeals Office mailed petitioners a Notice of Determination Concerning Collection Action(s) Under Section 6320 and a Notice of Determination Concerning Collection Action(s) Under Section 6330.

Respondent concedes that petitioners' carryback with respect to their claimed theft loss during 2006 was within the scope of the Appeals hearing and should have been considered by Ms. Amper. However, respondent's motion indicates that respondent does not intend to seek remand of petitioners' case to the Appeals Office for consideration of the issue.

<u>Discussion</u>

Rule 121(a) provides that either party may move for summary judgment upon all or any part of the legal issues in controversy. Full or partial summary

**[\*12]** judgment may be granted only if no genuine issue exists as to any material fact and the issues presented by the motion may be decided as a matter of law. See Rule 121(b); Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). The moving party bears the burden of proving that there is no genuine issue of material fact, and factual inferences are viewed in the light most favorable to the nonmoving party. Sundstrand Corp. v. Commissioner, 98 T.C. at 520. However, the party opposing summary judgment must set forth specific facts that show a genuine issue of material fact exists and may not rely merely on allegations or denials in the pleadings. Rule 121(d).

Section 6321(a) provides that if any person liable to pay any tax neglects or refuses to pay after demand, the Commissioner may collect such tax by placing a lien on the person's property or rights to property. Section 6331(a) provides that, if any person liable to pay any tax neglects or refuses to do so within 10 days after notice and demand, the Commissioner may collect such tax by levy upon property belonging to such person. However, the Commissioner is required to give written notice of his intent to file a lien or to levy and must inform the taxpayer of the right to request a hearing before the Commissioner's Appeals Office. Secs. 6320(a), 6330(a). A hearing under section 6320 is conducted in accordance with the procedural requirements of section 6330. Sec. 6320(c). At the hearing, the

[*13] taxpayer may raise any relevant issues including appropriate spousal defenses, challenges to the appropriateness of collection actions, and collection alternatives. Sec. 6330(c)(2)(A). Further, a taxpayer may dispute the underlying tax liability for any tax period if the taxpayer did not receive a notice of deficiency or otherwise have an opportunity to dispute the tax liability. Sec. 6330(c)(2)(B). Following a hearing, the Appeals Office must make a determination whether the proposed lien or levy action may proceed. In addition to considering issues raised by the taxpayer under section 6330(c)(2), the Appeals Office must also verify that the requirements of any applicable law or administrative procedure have been met, and whether the proposed collection action appropriately balances the need for efficient collection of taxes with the taxpayer's concerns regarding the intrusiveness of the proposed collection action. Sec. 6330(c)(1), (3).

Where the validity of the underlying tax liability is properly in issue, the Court will review the determination of the Appeals Office de novo. Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). However, where the validity of the underlying tax is not properly in issue, the Court will review the determination for abuse of discretion. Sego v. Commissioner, 114 T.C. at 610; Goza v. Commissioner, 114 T.C. at 181-182. The underlying tax liability is the amount unpaid after the application of all credits to

**[\*14]** which the taxpayer is entitled, including credits stemming from overpayments in other years. Landry v. Commissioner, 116 T.C. 60, 62 (2001). Our jurisdiction under section 6330(d)(1)(A) encompasses the consideration of facts and issues related to tax years other than the years covered in the notice of determination where the facts and issues from those other years are relevant in evaluating a claim that an alleged unpaid tax has been paid. Freije v. Commissioner, 125 T.C. 14, 27 (2005).

In the instant case, we have jurisdiction to consider petitioners' claimed theft loss deduction on their amended 2006 return because the carryback of that loss would reduce or eliminate the amount of unpaid tax with respect to petitioners' 2003 tax year. See id. Although petitioners have had the opportunity to dispute their underlying liability with respect to the theft loss stemming from the 2003 90% Stock Loan, they have not had the opportunity to dispute their underlying liability with respect to the theft loss stemming from the 2004 90% Stock Loans. Because most of the theft loss deduction claimed on their amended 2006 return stems from the 2004 transactions, respondent concedes that petitioners are entitled to dispute their underlying liability in the instant case. Accordingly, we review the determination of the Appeals Office de novo.

[*15] We have decided a number of other cases involving the 90% Stock Loan marketed by Derivium and its affiliates. In Calloway v. Commissioner, 135 T.C. 26 (2010), we rejected the taxpayer's argument that the 90% Stock Loan was a loan and instead held that it was a sale. To reach that conclusion, we analyzed the substance of the transaction under the factors set forth in Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. 1221, 1237-1238 (1981). Calloway v. Commissioner, 135 T.C. at 34-37. Those factors include: (1) whether legal title passes; (2) how the parties treat the transaction; (3) whether an equity interest was acquired in the property; (4) whether the contract creates a present obligation on the seller to execute and deliver a deed and a present obligation on the purchaser to make payments; (5) whether the right of possession is vested in the purchaser; (6) which party pays the property taxes; (7) which party bears the risk of loss or damage to the property; and (8) which party receives the profits from the operation and sale of the property. Id. at 34; see also Grodt & McKay Realty, Inc. v. Commissioner, 77 T.C. at 1237-1238. In Calloway, as in the instant case, Derivium did not hold the stock as collateral, but instead immediately sold it and gave the taxpayer 90% of the proceeds. Calloway v. Commissioner, 135 T.C. at 38-39. On the basis of the Grodt & McKay factors, we concluded that the taxpayer transferred all of the rights and privileges of ownership to Derivium and held that

**[\*16]** the transfer of stock was a sale, not a loan. Id. Since deciding Calloway, we have reached the same conclusion in a number of similar cases. See Landow v. Commissioner, T.C. Memo. 2011-177; Sollberger v. Commissioner, T.C. Memo. 2011-78; Kurata v. Commissioner, T.C. Memo. 2011-64; Shao v. Commissioner, T.C. Memo. 2010-189. In Calloway we noted: "The only right petitioner retained regarding shares of IBM stock was an option, exercisable three years later, in 2004, to require Derivium to acquire 990 shares of IBM stock and deliver them to him in 2004." Calloway v. Commissioner, 135 T.C. at 38.

Petitioners contend that the 90% Stock Loan was neither a loan nor a sale but rather a theft. Section 165(a) allows a taxpayer to deduct any loss sustained during the taxable year that is not compensated for by insurance or otherwise. Section 165(c) limits the deduction for individuals to losses incurred in a trade or business, losses incurred in a transaction engaged in for profit, and casualty and theft losses. Under section 165(e), "any loss arising from theft shall be treated as sustained during the taxable year in which the taxpayer discovers such loss." A taxpayer is not entitled to deduct a loss if he has a claim for reimbursement and there is a reasonable prospect of recovery. Sec. 1.165-1(d)(2)(i), (3), Income Tax Regs. A reasonable prospect of recovery exists when the taxpayer has a bona fide claim for recoupment from third parties or otherwise and there is a substantial

**[\*17]** possibility that such claims will be decided in the taxpayer's favor. Ramsay Scarlett & Co. v. Commissioner, 61 T.C. 795, 811, (1974), aff'd, 521 F.2d 786 (4th Cir. 1975). The amount of a casualty or theft loss is generally limited to the lesser of the property's reduction in fair market value or the property's adjusted tax basis. Secs. 1.165-7(b)(1), 1.165-8(c), Income Tax Regs. Taxpayers bear the burden of proving both the occurrence of a theft within the meaning of section 165 and the amount of the loss. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).

For tax purposes, whether a theft loss has been sustained depends upon the law of the jurisdiction in which the loss occurred. Bellis v. Commissioner, 540 F.2d 448, 449 (9th Cir. 1976), aff'g 61 T.C. 354 (1973); Edwards v. Bromberg, 232 F.2d 107, 111 (5th Cir. 1956); Monteleone v. Commissioner, 34 T.C. 688, 692 (1960). The exact nature of a theft, whether it be larceny, embezzlement, obtaining money by false pretenses, or other wrongful misappropriation of property of another, is of little importance provided that it constitutes a theft. Bromberg, 232 F.2d at 111; see also sec. 1.165-8(d), Income Tax Regs.

Because the alleged theft took place in California, we will apply California law. In California, all larcenous crimes have been consolidated into the single crime of theft, People v. Davis, 965 P.2d 1165, 1167 (Cal. 1998), defined in Cal.

**[\*18]** Penal Code sec. 484(a) (West 2010) as follows: "Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, * * * or who shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud any other person of money, labor or real or personal property * * * is guilty of theft." That statute encompasses at least two varieties of theft involving fraud. See People v. Ashley, 267 P.2d 271, 279 (Cal. 1954) (distinguishing theft by false pretenses and theft by trick or device). We need not concern ourselves with the technical distinctions between those larcenous offenses. Because petitioners contend that the theft involved fraud, for present purposes it is sufficient to observe that the following elements are essential under California law: (1) the perpetrator made a false pretense or representation which materially influenced the owner to part with his property; (2) the perpetrator did so knowingly with the intent to defraud the property owner; and (3) the owner was actually defrauded. Id. at 279, 282; People v. Traster, 4 Cal. Rptr. 3d 680, 686-687 (Ct. App. 2003); People v. Sanders, 79 Cal. Rptr. 2d 806, 810-811 (Ct. App. 1998).

Petitioners attempt to distinguish the facts of their case from those of Calloway and the other prior Derivium cases by arguing that, under the terms of the Master Loan Agreements they signed, Derivium had the right to sell their stock

[*19] only during the "Loan Term". Because the schedules A-1 defined the "Loan Term" as beginning on the date the loan proceeds were distributed and because Derivium sold their shares of ValueClick stock before the loan proceeds were distributed, petitioners contend that the sale of their ValueClick stock was a theft. Petitioners contend that the amount of their theft loss is the adjusted basis in their shares of ValueClick stock, which is the amount they claimed on their amended 2006 return.

We are not convinced by petitioners' "Loan Term" argument. The loan agreements in the prior Derivium cases we have considered are nearly identical to the loan agreements in the instant case. For instance, in Calloway the loan agreement gave Derivium the right to sell the stock "during the period covered by the loan", and the Schedule A-1 stated that the loan term was measured "starting from the date on which final loan proceeds are delivered on the loan transaction." Calloway v. Commissioner, 135 T.C. at 29. Similarly, the loan agreements in Kurata and Landow also permitted Derivium to sell the stock only "during the period covered by the loan." See Landow v. Commissioner, T.C. Memo. 2011-177; Kurata v. Commissioner, T.C. Memo. 2011-64. We conclude that there is no meaningful distinction between the phrases "during the period covered by the loan" and "during the Loan Term". In Calloway, Kurata, and Landow, despite the

**[*20]** ostensible limitations on the period during which Derivium was authorized to sell the taxpayers' stock, Derivium nonetheless sold the stock before it distributed the loan proceeds. In Landow, we rejected the taxpayers' argument that the Derivium transaction constituted a theft that resulted in an involuntary conversion under section 1033(a). We similarly reject petitioners' "Loan Term" argument.

However, the instant case is distinguishable from the prior Derivium cases we have considered for a different reason. In none of the prior Derivium cases we have considered did the taxpayers attempt to exercise their rights to a return of their collateral after the maturity dates. Rather, in the prior Derivium cases we have considered: (1) the value of the supposed collateral had declined so that the taxpayers either (a) walked away from the loan, see Calloway v. Commissioner, 135 T.C. at 32; Kurata v. Commissioner, T.C. Memo. 2011-64, or (b) renewed the loan and payed a fee to do so, see Shao v. Commissioner, T.C. Memo. 2010-189; or (2) the loan had not yet reached maturity, see Landow v. Commissioner, T.C. Memo. 2011-177; Sollberger v. Commissioner, T.C. Memo. 2011-78. In contrast, after initially trying to renew the loan, petitioners requested the return of their shares of ValueClick stock, the value of which would have exceeded the amount of interest and principal due on their loan. Pursuant to the terms of the Master

**[\*21]** Loan Agreement, Derivium was obligated to return petitioners' collateral to them at the end of the Loan Term, after deducting the amount of interest and principal petitioners owed. However, petitioners' stock was not returned, which, as noted above, led to their investigation of Optech, WITCO, Derivium, and Messrs. Cathcart and Debevc.

As we stated in Calloway, Derivium's 90% Stock Loan transactions, such as those in issue in the instant case, can be characterized as sales of stock and the simultaneous purchase of options,[8] exercisable on the maturity dates, to purchase equivalent shares of stock. See Calloway v. Commissioner, 135 T.C. at 38. Each option's strike price is equal to the principal on the loan plus the interest due. The affidavit signed by Mr. Raifman in support of petitioners' opposition to respondent's motion for summary judgment states that petitioners believed that Derivium would engage in a hedging strategy to ensure that it would be solvent

---

[8]In New Phoenix Sunrise Corp. v. Commissioner, 132 T.C. 161, 166 (2009), aff'd, 408 Fed. Appx. 908 (6th Cir. 2010), we defined an "option" as follows:

> An option is a contract that gives the buyer the right, but not the obligation, to buy or sell an asset at a predetermined price (the strike price). In exchange for selling an option, the seller receives from the purchaser a premium which reflects the value of the option. The risk to a purchaser of an option is limited to the premium. The risk to the seller of an option can be unlimited; it is the difference between the strike price and the market price of the asset at expiration less the premium. * * *

[*22] and able to fulfill its obligations under the Master Loan Agreements to deliver to petitioners, on the dates of maturity, all of their shares of ValueClick stock if petitioners sought to exercise their options. Instead, it appears that Derivium engaged in no hedging strategy at all and that it had initially used funds from other borrowers to return collateral to some borrowers in a contrivance resembling a Ponzi scheme. See Shao v. Commissioner, T.C. Memo. 2010-189 (recounting Derivium's history). When it sold its clients' stock, Derivium apparently funneled to various offshore businesses the 10% of funds not returned to the clients. See Grayson Consulting, Inc. v. Wachovia Sec., LLC (In re Derivium Capital, LLC), 437 B.R. 798, 802 (Bankr. D.S.C. 2010). As a result of the true nature of Derivium's hedging strategy (or lack thereof) and because of additional legal troubles with the State of California and the Internal Revenue Service, Derivium was soon insolvent and filed for bankruptcy protection. See Shao v. Commissioner, T.C. Memo. 2010-189. When petitioners attempted to exercise their first option during 2006, Derivium failed to respond to any of petitioners' letters.

From the beginning, according to Mr. Raifman's affidavit, Derivium misrepresented the nature of the transaction into which petitioners entered. As far as we can tell, Derivium never engaged in a plausible hedging strategy. Instead,

[*23] its alleged actions appear to be tantamount to a massive bet that the price of all of its clients' stocks would fall, "hedged" only by a Ponzi scheme. Mr. Raifman also states in his affidavit that petitioners relied on Derivium's misrepresentations when they chose to enter into the 90% Stock Loan program and that they were defrauded. Indeed, it appears that the failure of Derivium to honor petitioners' options to repurchase their ValueClick stock cost petitioners millions of dollars. On the basis of the statements in Mr. Raifman's affidavit,[9] we conclude that the instant case is distinguishable from Landow and the other prior Derivium cases. Accordingly, we conclude that there remains a dispute over genuine issues of material fact concerning the existence of a theft loss under California law.

Additional genuine issues of material fact appear to us to remain in dispute with respect to petitioners' claim of a theft loss. At trial, we expect that petitioners will need to introduce, inter alia, evidence proving the amount of their loss, which will likely require valuation of the options to repurchase the ValueClick stock. Additionally, we expect that petitioners will need to introduce evidence showing that, at the time they claimed the theft loss deduction for 2006, they had no

---

[9]We are required, for purposes of deciding respondent's motion for summary judgment, to view these factual statements in the light most favorable to petitioners, as the nonmoving party. See Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994)

[*24] reasonable prospect of recovery, including no possibility of recovery on their claims against their investment advisers or Wachovia.

On the basis of the foregoing, we will grant respondent's motion for summary judgment insofar as we conclude that petitioners' transfers of stock to Derivium under the 90% Stock Loan were sales and not loans, but we will deny respondent's motion for summary judgment insofar as we conclude that genuine issues of material fact remain as to whether petitioners may be entitled to a deduction for a theft loss in the amount of the value of the options they purchased from Derivium that may be carried back from petitioners' 2006 tax year to petitioners' 2003 tax year.[10]

---

[10]We are puzzled by respondent's choice not to seek remand of petitioners' case to the Appeals Office, despite respondent's concession that the Appeals Office erred by failing to consider whether petitioners' carryback with respect to their claimed theft loss during 2006 was within the scope of the Appeals hearing. Accordingly, we will order respondent to wait until he has concluded the examination of petitioners' amended 2006 return before proceeding with the instant case in this Court. In that regard, we will also order the parties to submit a status report advising the Court when the examination of petitioners' 2006 return has been concluded.

**[\*25]** In reaching these holdings, we have considered all the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order will be issued</u>.